### GERMAN INSURANCE COMPANY v. I. M. PEARLSTONE & SON.

Decided May 11, 1898.

**1. General Demurrer—Ownership of Insured Property.**

See petition upon contracts of insurance which, though not directly alleging plaintiff's ownership of the property at the time of its destruction, was held not subject to general demurrer under the rule indulging in such case every reasonable intendment in favor of the plaintiff.

**2. Insurance—Pleading—Property Destroyed.**

Owners of a stock of merchandise constantly shifting by frequent purchases and daily sales can not, in suing to recover insurance thereon, give a correct itemized list of the property destroyed, nor be required to do so upon special exception.

**3. Evidence—Opinion.**

Experts may explain the meaning of technical words or phrases, but can not give an opinion as to whether certain facts constitute a compliance with a contract; thus a bookkeeper can not be asked whether he would consider the furnishing a ledger and journal a sufficient compliance with a contract to furnish a set of books showing a complete record of business transacted.

**4.  Opinion—Hypothetical Question.**

A hypothetical question addressed to an expert should not submit a condition of facts not warranted by the testimony.

**5.  Insurance—Production of Books.**

Books so kept and produced as to enable the insurer with reasonable certainty to arrive at the amount of loss substantially comply with the undertaking (the "iron safe clause") by insured to keep and produce a set of books "showing a complete record of business transacted, including all purchases and sales, both for cash and credit."

**6.  Same.**

See evidence as to books kept and produced by insured (certain books relating to the business during a part of the life of the policy having been burned) held, to present a case in which the question of compliance by insured with the "iron safe clause" was for the injury, and a charge to find for defendant by reason of failure of insured to comply with such undertaking was not warranted.  .

APPEAL from McLennan.  Tried below before Hon. MARSHALL SUR-RATT.

*Oeland & Brown,* for appellant.

*Alexander & Atkinson,* for appellee.

KEY, ASSOCIATE JUSTICE.—This is a suit upon two policies of fire insurance.  The plaintiffs recovered in the court below, and the defendant has appealed.

1.  The first question for decision arises upon the action of the court in overruling a general demurrer to the plaintiff's petition, the contention being that it does not appear therefrom that plaintiffs were the owners of the property insured, at the time of its destruction by fire. The only averments in the petition that bear on this subject are these:

"That on the 3d day of September, 1895, defendant, in consideration of the sum of $87.50 to it in hand paid, issued its policy of insurance No. 76304, wherein and whereby it insured plaintiffs in the sum of $2500 against loss by fire for the period of one year on their stock of merchandise, consisting of dry goods, clothing, notions, groceries, produce, and such other merchandise not more hazardous as is usually kept for sale in country stores, while contained in the two one-story, metal roof, stone buildings in I. C. addition in rear, occupied by the assured as a general store and situated adjoining and communicating on lots Nos. 5 and in block No. 3, in Buffalo, Texas: which stock so insured by said policy was then and there of the reasonable value of $25,000.

"Plaintiffs further show to the court that on the 4th day of October, 1895, the said defendant, in consideration of the sum of $35 to it in hand paid, executed and delivered to plaintiffs its policy of insurance No. 76311, wherein and whereby it insured these plaintiffs in the sum of $1000 against loss by fire on the goods, wares, and merchandise hereinbefore described and paintiffs show that they have complied with all the conditions of said policies.  It is further shown to the court that about the 19th day of August, 1896, while said policies were in full force

and effect, the property insured thereby was, without default of these plaintiffs, destroyed by fire, and on the 5th day of October, 1896, full proofs of loss were made out by plaintiffs and forwarded to defendant, and received and accepted by said defendant, no objection being made thereto. Defendant is notified to produce said proofs of loss on trial hereof.

"Plaintiffs show to the court that by reason of the premises defendant became liable and promised to pay these plaintiffs the sum of $3500 in accordance with the terms of said policies, but though often requested, they have hitherto failed and refused and still fail and refuse to pay the same or any part thereof, whereby these plaintiffs have been damaged in the full sum of $4000."

Fire insurance is a contract of indemnity; and unless the owner of the policy is also owner of or interested in the property covered by it at the time the latter is destroyed by fire, he sustains no loss, and therefore can not recover upon the policy. This point is well settled by the authorities, and this court has recently ruled upon it. Insurance Co. v. Davis, 45 S. W. Rep., 604, and authorities there cited. And it must be conceded that the petition in this case does not in express terms allege that the property belonged to the plaintiffs at the time it was destroyed by fire. However, the petition does aver that the defendant insured the plaintiffs against loss by fire, "on their stock of merchandise, consisting of dry goods," etc. This constitutes an averment of ownership of the property by plaintiffs, and it is not expressly limited to any particular date. Besides, the petition charges that the policies were in force and effect at the time of the fire; and as they could not have been in that condition (if the policies were then owned by plaintiffs) unless they had an interest in the property, the latter fact is argumentatively or impliedly charged. Furthermore, the petition charges that the defendant insured the plaintiffs against loss of their property by fire; and thereupon the defendant became liable to the plaintiffs for the sum of $3500, the face of the policies. Now the liability alleged could not exist unless the plaintiffs owned or had an insurable interest in the property at the time it was burned; and the averment of such liability, in connection with the other averments referred to, indicate that the petition was constructed upon the theory that the plaintiffs owned the property at the time of its destruction, and that it was intended that it should be so understood.

District Court Rule 17 prescribes, that in passing upon a general exception every reasonable intendment arising upon the pleading excepted to shall be indulged in favor of its sufficiency; and that rule has been often applied. In view of this rule, we hold that the petition was not obnoxious to a general demurrer; and in support of our ruling, we cite Pennington v. Schwartz, 70 Texas, 211; Loper v. Tel. Co., 70 Texas, 694; Wynne v. Bank, 82 Texas, 378; Rutherford v. Smith, 28 Texas, 322; Land and Cattle Co. v. Carroll & Iler, 63 Texas, 49; Bank v. Security Co., decided by this court at this term.

2.   The property insured was a stock of merchandise, alleged to be worth over $20,000.   The plaintiffs were, when the policies were issued and the fire occurred, retail merchants; and their stock of merchandise was constantly shifting, goods coming in by purchases frequently made, and going out through the medium of daily sales.   Under these circumstances it was impossible for the plaintiffs to furnish a correct inventory or itemized list of the property destroyed by the fire; and the court did not err in overruling the defendant's special exception addressed to the petition because it was not accompanied by such inventory or list.

3.   After they had qualified to testify as expert bookkeepers, appellant propounded to the witnesses Toby, Conner and Picket the following question: "Would you consider the furnishing of a ledger and journal a substantial compliance with the contract requiring the furnishing of a set of books showing a complete record of the business transacted, the evidence in the case having shown that seven or eight different books were kept?"   The court sustained objections to this question, and appellant assigns error.   We think an answer to the question would have invaded the province of the jury.   Experts may be permitted to explain to juries the meaning of technical words or phrases; and perhaps it would have been permissible for the witnesses referred to to have explained what in their opinions would constitute a set of books, showing a complete record of such a business as appellees were engaged in.   But we do not think any witness should be permitted to give an opinion as to whether or not certain facts constitute compliance with a contract.   Besides, the hypothesis upon which the question was based did not include all the facts.   It assumed that appellees produced but two of the seven or eight books kept during the life of the policies; whereas, they produced all the books for the entire year 1896, and the fire occurred August 19th of that year.   They also produced the ledger and journal for the entire year 1895, and the petty cash book, covering the time from October 21, 1895, to the end of that year.   One of the policies was issued September 3, and the other October 4, 1895, and they were both in force when the fire occurred.   So it appears that for seven months of the time appellees produced their full set of books, and for nine months of the time they produced the ledger, journal, and petty cash book; while for forty-five days of the first and seventeen days of the second policy they produced only the ledger and journal.   The question propounded to the witnesses impliedly states that the latter two were the only books covering the life of any part of either policy that was produced.

4.   The remaining question presented for decision arises upon the refusal of the court to give a special charge asked by the defendant peremptorily instructing the jury to return a verdict for it.   It is claimed that this charge should have been given, because the undisputed evidence showed that the plaintiffs had not complied with the "iron safe clause" in the policy.   That clause reads thus:   "The assured under this policy hereby covenants and agrees to keep a set of books during the life

of this policy, showing a complete record of business transacted, including all purchases and sales, both for cash and credit, together with the last inventory or the last two inventories of said business, if such inventories have been taken; and further covenants and agrees, that if no inventory in detail has been taken within twelve calendar months next prior to the issuance of this policy, that one will be taken in detail within thirty days from date hereof, or this policy shall be null and void; and the assured further covenants and agrees, that if no prior inventory as provided for above has been taken and loss or damage occur within the meaning of this policy within thirty days above allowed for the taking of inventory in detail, after the issuance of this policy and prior to the taking of such inventory in detail, then this company shall be liable only on such goods as the original bills thereof, or certified copies thereof, can be produced; and the assured further covenants and agrees to keep such books and inventories; also all books, memoranda, vouchers, and other evidences of the business transacted prior to the issuance of this policy securely locked in a fireproof safe at night, and at all times when the store mentioned in the within policy is not actually open for business, or in some other secure place not exposed to fire which would destroy the house wherein said business is carried on, and in case of loss, the assured agrees and covenants to produce such books, bills (or certified copies therof), and inventories, and in the event of a failure to produce the same this policy shall be deemed null and void, and no suit or action at law shall be maintained thereon for any such loss."

The evidence bearing on this branch of the case is given in appellant's brief, as follows:

"S. L. Hart for the plaintiff, testified: 'I. M. Pearlstone & Son kept books showing the condition of their business and kept an inventory; they had a bookkeeper for that purpose and the books were correctly kept. While I did not keep the books, I examined them from time to time and know that they were correctly kept. I am a bookkeeper myself; have had twenty-five years' experience in the business. I was at home and in bed on the night that the fire occurred, but I got up, put on my clothes, and ran to the fire.

" 'We took an inventory of the business on the 1st of July, 1896, and the fire occurred on or about August 19th following. Mr. Shumard, general agent for the State for this company, visited Buffalo just after the fire. When Mr. Shumard came there, we furnished him all the books and the inventories we had. Both the inventories of January and July, 1896, were examined by him. We also furnished him the inventories for January and July, 1895. We had a set of books in the safe showing the condition of the business. These were books for 1896; we did not have a complete set of books for 1895; we did not have the invoices from the wholesale merchants at that time, but we sent and got them for Mr. Shumard. We had a regular bookkeeper, but whenever he was away, I looked after the books. We kept a complete set of books. By a complete set of books I mean a ledger, day book, journal, petty cash book, general

cashbook, invoice book; I have all these books for the year 1896. I started a new set of books at the beginning of each year. We wrote up three or four day books each year. I have got all the books that we kept for the year 1896, up to the date of the fire. We kept the same number of books in the year 1895; that is, we kept a complete set of books in 1895. The books for 1895 were destroyed in the fire, except the ledger for 1895, which we have. I do not know where any of the books for 1894 are; they may be down at the sash door house. We always kept the books for the year preceding in the store; kept both the books for the year in which we were doing business and the year previous, as in making out a bill or in making out an account we frequently had to refer to the books for the year previous, and on this account we had the books for the year 1895 in the store. They were all destroyed except the ledger, a part of the cash book, a part of the invoice book, and journal. They are not a complete set of books for the year 1895, but are only a part of them. All the books that we saved for the year 1895 are the ledger, the journal, and the petty cash book from October 19, 1895; the ledger for 1895 began in January, 1895, and ended December 31, 1895. All the other books for 1895 were destroyed in the fire; the books that we could not keep in the safe were kept right above the safe. I think the books for 1895 were kept above the safe at the time of he fire, and were destroyed by the fire.

"'We had a complete set of books for the year 1895. We kept two cash books, a petty cash book and a general cash book, and we kept day books and invoice books, ledger and journal. We kept blotters in the store for the salesmen; the entries from the blotters were transferred to the day book. Out of the seven books we produced the ledger and the journal and the petty cash book from the 19th day of October, 1895.

"'The ledger and journal for 1895, which I have before me, contain a complete account of the cash and credit sales, and of the cash and credit purchases of the firm of I. M. Pearlstone for that year. From these two books I can make a detailed statement of the business of I. M. Pearlstone & Son, both as to the purchases and sales for the year 1895. When Mr. Shumard came there after the fire he was furnished with these books for 1895, and with the inventories of the business.

"'In the rock building we kept two blotters, one in the grocery department and one in the dry goods department. We had a separate blotter for the lumber department; this also embraced the coffins. The furniture was entered in the blotter in the dry goods department; that is we kept three separate blotters in running the business—one for lumber, one for dry goods and furniture, and the other for groceries The grocery blotter included groceries that were not covered by this policy. I could not give any estimate of the number of blotters that were kept in the dry goods department for the year 1895. I can not give the jury the number of blotters kept in the grocery department for the year 1895. The entries on the blotters of the dry goods house were transferred to the day book. The entries on the blotters of the groceries were entered

into the day book. The entries in the blotter for the lumber were transferred directly into the ledger. The other blotters were transferred into the day book. We were running three blotters in the business. I can not tell the number of blotters that were used in each department for the year. Two of those blotters—that is, the blotter for the dry goods house and the blotter for the grocery house—were transferred into the day book. The blotter for the lumber establishment was copied directly into the ledger. The blotter for the lumber business occupied the position of a blotter and a day book both, but the blotters for the dry goods and grocery department were transferred into the day book. All of these blotters were kept by different men. The entries from the day book were transferred to the ledger. This was done by the bookkeeper every day. The ledger which we furnished for the year 1895 has got in it the entries transferred from the blotters kept for the lumber house, and the entries transferred from the blotters kept in the grocery department, and in the dry goods department into the day book, and from the day book into the ledger. I could not tell how many day books we kept for 1895. All the day books for 1895 were destroyed. All the blotters for these three separate lines of business for 1895 are gone, too. The day books, in my opinion, were all burned. The safe would not hold all the books, and the books that were not needed for 1895 were stacked above the safe. The blotters for 1895 may or may not have been burned. In addition to the blotters and day books above mentioned we kept a general cash book. The general cash book for 1895 is gone. The general cash book usually lasted a year. We usually used about two petty cash books a year. The general cash book for 1895 is gone, and the petty cash book for 1895 is gone up to October 21, 1895, and the petty cash book that we produced begins on October 21, 1895. The cash sales were entered in both cash books, and then transferred from the cash book to the ledger. When we made a cash sale it was entered in the petty cash book and then transferred into the general cash book. In other words, the petty cash book occupied the position to cash that the blotters did to merchandise. The entries were originally made into the petty cash book and then transferred into the general cash book and then to the ledger. We had a cashier who received the cash, and at night he turned in his cash to the bookkeeper. The petty cash book was a book of original entry as to cash sales. As to cash, there are two intermediate books missing up to October 21, 1895, and from October 21, 1895, there is one intermediate book missing, which is a general cash book. Supposing that one of the jurors had been trading with our firm for 1895, and I was to demand a settlement with him by the books we produced for 1895, I could show him the amount that he owed, but I could not show him the items of the account. I could not inform him by an itemized statement the number, nature, and date of the goods that he bought. That is, I could not do this from the books we now produce for the year 1895. In other words, we could not furnish any of the credit purchasers for 1895, who should dispute their account, an itemized list of the things that they

got and the dates that they got them. We could just furnish him with the amount of his debt, and tell him that it was correct. We could not check up the account of any individual and say that it was correct except just by showing the amount. We could not check up the cash account by these books that we produce for 1895. It shows the cash credits on the merchandise accounts from month to month, but it does not show the cash each day that we received. It does not show the daily transactions of cash at all.

" 'It shows the result of each month, but it does not show the daily cash transactions. There is no way for us from these books to show the daily transactions for 1895. The purchases that we made were entered into the invoice book. As to the purchases, the invoice book was a book of original entry. I do not think we kept but one invoice book for the year 1895. We kept one invoice book for the entire business. In other words, goods purchased for the lumber house, dry goods house, grocery house, and other departments were all entered in this invoice book. The invoice book for 1895 is gone. I can not turn to the books that we have for 1895 and show you what our purchases for cash and for credit for September 4, 1895 were. I can show you the bulk of the purchases for cash and for credit at the end of each month, but can not show you purchases for cash and credit for any one day for the year 1895. The purchases for cash and for credit for any one day can not be shown by the books, but it is all embraced in the month's work and the books show the summary for the month. I can not from the books for 1895 furnish you the cash and credit sales for the 4th day of September, 1895. I can not furnish in detail the amount of the goods sold for cash and credit for any day of the year 1895. I can furnish you the cash sales for any one day after October 21, 1895, by referring to the petty cash book. From the 4th day of September, 1895, to the 21st day of October, 1895, I can not furnish specially the cash or credit sales for any one day. From October 21, 1895, to December 31, 1895, I can not show you the credit sales for any one day. We could demonstrate the correctness of our ledger for 1895 by the books balancing. It is true, a man can fraudulently make a set of books balance, and can force a balance in any kind of a set of books. We could not demonstrate the correctness of the books by proving the correctness of any particular entries, because the books of original entry are gone. At the close of each month we took our general cash book, the footings were carried over from day to day, and at the end of the month they were footed up and totaled. The cash from the cash sales, we will say in February, at the close of last February being $2178.50, is entered in here as taken from the general cash book. Before it is posted in here it is gone over and checked up, and the general cash book must correspond at the close of each month with this petty cash book; each day it is checked up and must correspond. The two balances must be identically alike. At the close of each month they are all checked over to see that no error has occurred, and then entered to the credit of merchandise. I can not go back and check up the cash

book in order to tally with the entry on the cash book on the merchandise account for a certain day. I could do this if I had those two cash books. I swear that these books are correctly kept. I could make a list or statement of the merchandise purchased for cash and credit during the year 1895; also a list of the merchandise sold for cash and credit during the year 1895. For instance, in the month of January this ledger shows sales on credit, $6296.23. In order to ascertain whether or not that is correct, I start with each and every man's account in the ledger, and draw off the merchandise sold to this man, for instance, Henry Brown, for the month of January, and I go to the next man and I put down on a sheet of paper his purchase of merchandise during the month of January, and so on during the entire ledger, and take these figures and add them up. If those figures add up the same as credit and merchandise during the month of January, then that is correct, and so on throughout the entire year. Those are sales on credit. I get the sales for cash for the year, for each and every day's sales are entered into the cash book. They are transferred from there to the general cash book. The general cash book must each day tally with the petty cash book. In other words, every cash item is entered up in detail in the petty cash book. Each sum that has been paid out or paid in during each day enters into this book. In other words, this is simply a hand book the bookkeeper uses for convenience. Every item is entered into the general cash book. It is just doing double work to keep it in a nice, neat way. At the close of each day these figures were totaled up and the general cash book is totaled up after this had been copied into it. Both sides, debit and credit, are added up and the less is taken from the greater, and the balance is the cash on hand. The cash is then counted and must correspond with the cash book. The only difference between these and the general cash book is that in the general cash book we have it ruled down in lines, one for cotton, one for merchandise, etc. Here is one right here. This is expense, merchandise, and cotton on the debit side; there is lumber, merchandise, and interest on the credit side. They are simply carried forward from day to day, and each day must balance with the footings in the cash book, and at the end of each month the merchandise will show a certain amount, lumber will show a certain amount, and the interest will show a certain amount.

" 'Sales for cash during the month of January, 1895, were $2931.43; cash sales for February, 1895, $2118.50; credit sales were $6409.73; from the ledger I can show the amount of the purchases of merchandise from wholesale merchants for one month by simply turning back here and deducting each and every month, as I above stated, in the selling. It is identically the same, only it is directly opposite. For instance, all these foreign accounts, which we call foreign accounts, are accounts with people from whom we purchase, and are usually in the back of the ledger; we usually use about one hundred pages of the back of the book for this purpose. Now, if you take and add up the foreign purchases that we have purchased from parties, add them all up each month as they ap-

pear in the book, then add them all together, they will correspond identically with the fore part of the ledger. Purchases in January were $8443.92; these are goods we bought. Now, if we take the interest that the foreign parties are credited with, they will offset the balance, that is the amount right here. From the ledger and inventory we can make up a correct statement of our merchandise accounts for the year 1895 and 1896. I can take either of the ledgers, without any of the other books, and make up a statement here of the amount of purchases during the year, also the amount of the sales. The amount of the goods that we started with on January 1, 1895, is $32,722.63, as shown by the inventory. The stock on July 1, 1895, was $20,838.30. We took stock every six months, and used that as a starting point in our ledger. I can take the ledger and show how much we owe and how much is owing to us, how much merchandise has been purchased, how much we have sold, and how much ought to be on hand.' (The witness here identified several papers as invoices.) 'We got these invoices at Mr. Shumard's request; he is the agent of the company; we got invoices for 1895 and 1896, some of them as far back as 1894; they were submitted to Mr. Shumard, and he and I checked them over. They correspond with the ledger and were drawn approximately correct. Some concerns had gone out of business, and we could not get invoices from them; we obtained all, however, but a very few. I know nothing of the origin of the fire. I left there about sundown on the night of the fire; this was the time I left to go home. I always left Mr. Sheffield to close up the store and go home. We always closed the east window first. The fire occurred about 12 o'clock that night.'

"John M. Conner, for the defendant, testified: 'I am an experienced bookkeeper; have been engaged in that business for fifteen years, and am thoroughly acquainted with bookkeeping and accounting.'

"The evidence before the jury here shows that the firm kept three different sets of blotters, two of which were run into a day book and the third directly into the ledger, and then from the day book the entries were made into the ledger, and then, in addition to that they kept a petty cash book, and the entries from the petty cash book were run into the general cash book, and then the footing for each month of the general cash book were entered into the ledger; then they kept a journal and invoice book and ledger. Now they furnish us with a ledger and journal up to (we are now speaking of the year 1895) the 20th day of October, 1895.

" 'Now, could these books, namely, the journal and ledger, produced here, be considered a complete set of books?'

"Answer: 'They could not be considered a complete set of books unless the cash account was kept in the ledger. The cash book is one of the accounts of a ledger, and without the cash account, the books are not complete. There is no way to verify these two books produced; no way to verify their correctness. The petty cash, produced from October 21, 1895, if it contained all the entries of cash, would make the book com-

plete, as I do not consider that the general cash book is necessary. There would be no way to determine whether all the entries in the petty cash book went into the general cash book, unless you had the general cash book. There is no way to determine that the petty cash book contained all the cash transactions, because the entries were not transferred from the petty cash book direct to the ledger, and without the general cash book you can not trace back from the ledger to the petty cash book. Books of original entry are usually the journal and cash book; in other words, in the book which the original entries are made with explanatory note. This depends upon the system of bookkeeping. A book of original entry is where the entry is originally made and explained. The ledger in this case, under the system of bookkeeping as explained to me, can not be considered a book of original entry. It is merely a book of results, and there is no way to verify these results with the books that are furnished in this case. I do not know of any way to verify the results entered into this ledger and journal and petty cash book, and certainly the three books produced, under the system of bookkeeping mentioned can not be considered a complete set of books. If one of the jurors had been dealing with the firm in 1895, and wanted an itemized statement of his account, there is no way that this could be furnished from the books that are produced here. There is no way from the books furnished to determine the amount of the cash and credit sales for any particular day in the year 1895. There is no way to determine from the books furnished here what the word sundries means, as entered in the ledger. There is no way from the books furnished to verify the cash and credit sales for any one month in the year 1895. From the books furnished, there is no way to determine the correctness of the books kept during the year 1895.'

"Edward Toby, Jr., witness for defendant, testified: 'I am engaged in teaching a business college, and am an expert accountant. I am thoroughly acquainted with bookkeeping, and all the methods of bookkeeping.'

"Question: 'Now, there is a system of bookkeeping under investigation before the jury; the proof shows that the parties kept three different blotters, one for the grocery establishment, one for the dry goods establishment (all under the same general management), and one for the lumber establishment; that the grocery and dry goods blotters were entered into the day book; that the lumber blotter was entered directly into the ledger; that the day book was transferred into the ledger; and in addition to that, they kept a petty cash book and a general cash book; they kept a journal, an invoice book, and a ledger. Now, they furnish us up to October 21st, speaking of the year 1895, with a ledger and journal. Can those two books be considered a complete set of books for that year?'

"Answer: 'No, sir.'

"Question: 'Is there any way of verifying the correctness of the results of those books?'

"Answer: 'There is no way of verifying a set of books without the books of original entry. If you use the books that are called blotters, and it is not posted from, it is an auxiliary book, but in the terms of bookkeeping, every book that is posted from to the ledger becomes a book of original entry. While a book may not be termed in bookkeeping a book of original entry, an auxiliary may be, in fact, a book of original entry. Where a blotter is transferred direct into the ledger, it becomes a salesbook. Where blotters are transferred into a day book, and the day book into a ledger, the day book, in the terms of bookkeeping, would be a book of original entry, because it is posted into the ledger, but in truth and in fact the blotters are books of original entry, and the correctness of the ledger would depend upon the accuracy of the two blotters and of the day book. If the blotter was posted direct into the ledger you would only need to verify the ledger; but if it is posted into the day book you would need both the blotter and the day book. You can not verify any system of books without the book of original entry. Where the ledger contains the results of each month there is no way to determine the cash and the credit sales for any one day of the year. This can not be done without the books of original entry. No one who was dealing with the firm for the year 1895 could determine and find out and get an itemized list of the goods and the dates on which they were furnished him. This could be done if the ledger was itemized, but in this instance it was not itemized and contains only a summary of each month's work. The furnishing of these books before me would not be a complete set of books.'

"Question: 'In a mercantile business, where the books are kept, say the books of 1895 and the new books opened in January, 1896, and amounts transferred from the old books into the new books for 1896, balance is transferred from the old books into the new books and the new books opened up at the beginning of each year. Now, suppose new books are opened in 1896, and the balance was transferred into these new books, is there any way of determining the accuracy of the balance placed in the new books for 1896 unless you could test them by the books of 1895?'

"Answer: 'The balance taken from one year into another year? Yes, sir. The usual form of doing that would be to take a trial balance off from the new ledger. It, of course, should agree with the balance for the old ledger, and the only way you could verify these balances would be by going back to the old books. The correctness of the new books could only be tested by the books of the past year by verifying the balances brought forward into the new books. It is admitted that in this case, under the system of books kept by the firm, that a new set of books was opened on the 1st of January of each year, and the balance shown by the old books was brought forward and entered into the new books. If an inventory is taken every six months the inventory would be the stock on hand. If you had an inventory, say for July 1, 1896, and you assume that the inventory is correct, and a fire occurred in August, you add to

your inventory the goods that have been bought since your inventory was taken and you would allow the usual percentage that the business brings in the sales, and the difference between these two accounts would be the amount on hand.' "

In Brown v. Insurance Company, 89 Texas, 590, our Supreme Court, construing a policy similar to the policies involved in this case, held that substantial compliance with the "iron safe clause" was all that the law required; and that books so kept and produced as to enable the insurer with reasonable certainty to arrive at the amount of loss, should be deemed compliance with the contract. See also Assurance Co. v. Redding, 68 Fed. Rep., 708.

Furthermore, in deciding whether or not the court committed error in refusing to instruct a verdict for appellant, we think it is material to determine upon whom the burden of proof rested concerning the "iron safe clause." The parties proceeded in the court below upon the theory that the burden of proof in this respect was on the defendant. The plaintiffs did not plead compliance with the "iron safe clause;" the defendant did not except to the petition for not alleging such compliance; but averred in its answer that the plaintiffs had not complied with that clause of the contract.

In our opinion this was correct, and the burden of proof on that issue rested upon the defendant. Insurance Co. v. Rivers, 9 Texas Civ. App., 177.

If we are correct in this view, then, when the plaintiffs proved the execution and delivery of the policies sued on, the destruction of the insured property by fire, their ownership thereof, and that they had furnished the proof of loss required by the policies, they established a prima facie case and were entitled to recover, unless it was shown by the testimony that they had not complied with the "iron safe clause." Appellant's contention is that the books produced, covering the time from the issuance of the first policy—September 3, 1895—to the end of that year, were not all the books kept for that year, and that those produced do not show a substantial compliance with the contract. For the entire time in question two books—the ledger and journal—were produced, and for part of that time a third, called the petty cash book, was produced. Now, it devolved upon the defendant to explain to the jury the nature of these books, the character of entries that were made in them, etc., in order that they might be able to determine whether or not they would afford such information as would enable appellant with reasonable certainty to arrive at the amount of loss. As to the ledger and petty cash book, this explanation was made, but it was not made as to the journal; and what that book contained the evidence does not clearly show. It may be that the contents of the journal would materially assist in determining the amount of the loss; and as the contents of that book are not disclosed by the evidence, can it be truly said that the testimony clearly shows that the books that were not destroyed by fire, and were

produced thereafter, did not, in substance, afford appellant the information which it was the purpose of the "iron safe clause" to furnish? We think not.

Again, the suit is upon two policies; and the facts are not the same as to each. For instance, appellant's witness Connor said he did not consider a general cash book necessary where there was a petty cash book kept; but he attached importance to the fact that there was no petty cash book produced for 1895, covering the time prior to October 21st. Now, one of the policies was issued October 4, 1895, only seventeen days before the beginning of the petty cash book for 1895 that was preserved and produced. It was over ten months after the issuance of this policy until the fire occurred. Seventeen days is a small portion of ten months; and inasmuch as the general result of the cash book for each month had been transferred to the ledger and the ledger was produced, was it not proper to allow the jury to decide whether or not the failure to produce a cash book covering seventeen days was material. This is an additional reason why the court should not have instructed a verdict for defendant as to this policy; and the charge referred to applied to both policies.

We consider it unimportant that, from the books produced for 1895, the plaintiffs were unable to make itemized lists of the merchandise they had sold during that year. The ledger showed that they had sold so many dollars' worth of merchandise to the persons against whom the charges were made; and, as between appellees and appellant, these entries stand as admissions that appellees had sold the amount of goods shown by each entry; and therefore such amounts should be deducted from the goods bought, in determining the stock on hand when the fire occurrer, whether appellees could collect for the goods so charged or not.

We conclude that the court ruled correctly in refusing the special charge under consideration, and very properly submitted the question of compliance with the "iron safe clause" to the jury.

No complaint is urged against the verdict, hence we have made no formal findings of fact. We state, however, in general terms, that there is evidence to support the verdict on all the issues submitted to the jury. The appeal involves only the questions of law that have been discussed. If we have decided either of these wrong, the judgment should be reversed (if the case goes to the Supreme Court); otherwise, it should be affirmed.

In our opinion, no reversible error is shown, and therefore the judgment will be affirmed.

*Affirmed.*