## ÆTNA INSURANCE COMPANY *v.* JOHNSON.

1. What is commonly known as the "iron-safe clause," in a policy of fire insurance, requiring the insured to "keep a set of books, which shall clearly and plainly present a complete record of business transacted, including all purchases, sales, and shipments, both for cash and credit," is a promissory warranty.
2. Such promissory warranty must be complied with. But in determining what it requires, a fair and liberal construction is to be placed upon it, so as to effectuate the contract of indemnity, rather than defeat it.

3. Where a small store or "commissary" in the country was conducted in connection with a lumber business, and tickets were given to the employees for the sums due them for work, which were treated as cash at the store, the amount of purchases being indicated on the ticket by a punch and entered as a cash sale; and where it appeared that there were no credit sales, but the aggregate of such sales each day was entered at the close of the day, and that all goods were sold at a profit of from twenty-five to fifty per cent., it can not be said as matter of law that this was a violation of the requirement as to keeping books.

4. Where a merchandise account was kept as showing goods purchased, the aggregate amount of the whole being $558.87, and where some of the items stated the character of the goods and their price, but there were other items aggregating in amount nearly one half of the whole sum, which merely stated the name of some person or firm, with the added word "bill," and an amount, in the absence of any other evidence to show that there was in this regard a compliance with the requirement as to keeping books, it does not on its face appear to meet such requirement.

5. There was sufficient evidence to the effect that the company, through its agent, knew that the house insured stood on leased ground at the time when the application was made and the policy issued, and thereby waived a provision in the policy that it should be void if the building insured was on land not owned by the insured in fee simple, to authorize a submission of the question to the jury.

6. Whether a clerk of the agent could waive such a provision, or whether it would make any difference if the agent referred the applicant to his clerk or assistant, are questions not distinctly made in the record, so as to require a decision of them.

Submitted July 18, 1906.—Decided February 14, 1907.

Action on insurance policy. Before Judge Mitchell. Colquitt superior court. January 6, 1906.

*T. H. Parker* and *Shipp & Kline,* for plaintiff in error.

*Claude Payton* and *Humphreys & Humphreys,* contra.

LUMPKIN, J. Johnson brought suit against the Ætna Insurance Company on a policy of insurance covering a stock of goods and the building containing them. After a verdict for the plaintiff, the defendant moved for a new trial, which was refused, and it excepted. Two grounds for reversal are urged here: (1) That the plaintiff did not comply with the requirements of what is commonly known as "the iron-safe clause" of the policy, or that portion of it touching the keeping of a set of books. (2) That the policy provided that it should be void "if the interest of the insured be other than unconditional and sole ownership; or if the subject of insurance be a building on ground not owned by the insured in fee simple;" that the building covered by this policy was on leased ground, and that, therefore, the policy was void.

1-4. What is known as the "iron-safe clause," attached as a part of the policy, provided that "the following covenant and warranty is hereby made a part of this policy: ". . . The assured will keep a set of books, which shall clearly and plainly present a complete record of business transacted, including all purchases, sales, and shipments, both for cash and credit, from date of inventory as provided for in first section of this clause, and during the continuance of this policy." This clause has been held to be a promissory warranty in law, and not a mere representation. *Southern Ins. Co.* v. *Knight,* 111 *Ga.* 628 (2), 629; *Scottish Union Ins. Co.* v. *Stubbs,* 98 *Ga.* 754. As to whether an exact compliance with its terms is required, or whether a substantial compliance will suffice, the decisions are not in perfect accord. Our law of insurance had its beginnings in marine insurance; and Lord Mansfield, in respect to marine policies, under the state of insurance business as it then existed, took the former view. Pawson *v.* Watson, Cowp. 785; DeHahn *v.* Hartley, 1 Term R. 343. And other cases have followed more or less closely these precedents. Yet as early as 1704, in Bond *v.* Gonsales, 2 Salk. 445, it was held that "deviation or not must be construed according to usage." That was a case where a policy was issued on a ship sailing from Bremen to London, warranted to depart with convoy. It actually sailed first to the Elbe. The report states that "it was ruled per Holt, C. J., that the voyage ought to be according to usage, and that their going to the Elbe, though in fact out of the way, was no deviation; for till after the year 1703, there was no convoy for ships directly from Bremen to London." And see Pelly *v.* Royal Exchange Assurance Co., 1 Burr. 347, 350, and Tierney *v.* Etherington, there cited. In the development of the insurance business in modern times, the conditions and circumstances of the parties, the character of the contracts, and the relation of the parties to them, have produced a weight of authorities which have been applied to cases and in a manner not within Lord Mansfield's reasoning. Without entering into an extended discussion of the subject of warranties, it may be said that the current of authority as to what is known as the "iron-safe clause" is to the effect that it must be complied with, but that a reasonable, rather than a narrow and close construction will be given to such clause to prevent a forfeiture of the policy.

In Western Assurance Co. *v.* McGlathery, 115 Ala. 213 (67 Am.

R. 26, 29-30), Brickell, C. J., makes use of the following language, in considering the subject of substantial compliance, which is quoted at some length: "This clause, now almost universally introduced into policies of insurance of merchandise kept for sale against loss by fire, has been of frequent consideration by the courts, and most usually it has not been subjected to any narrowness or closeness of construction. Legal effect has been given it, for the purpose of guarding the insurer against the fraud or imposition of the insured; but it has received a fair, reasonable interpretation, so that it may not work forfeitures, or defeat the claim of the innocent insured to the indemnity promised by the policy. . . . If there must be precise, exact compliance with the clause, it would be difficult to determine and declare of what the compliance must consist. What is the degree of clearness and plainness which must be observed in the entries on the books? Is it that degree which will be satisfactory to an expert, scientific bookkeeper? If so, what system of bookkeeping must be observed? There are rival systems of bookkeeping, and the adepts in the one may regard the other as wanting in plainness and clearness. Or is it the degree which will satisfy the mind of the inquirer after the true state and condition of the business, not seeking to work or to avoid a forfeiture of the indemnity of the policy? How many books, and of what description, will constitute a set? Can it be said or supposed the minds of the insurer and the insured met, and would have given a common answer to these inquiries? Their minds did come together on the essence and substance of this clause, when its words are looked through, that it was the duty of the insured to preserve in intelligible form, in one or more books of his own choice, written evidence of his purchases,'of his sales, and of his shipments. If such evidence be preserved, the insurer is guarded against the fraud and imposition of the insured; and this is the purpose to be accomplished. There is no literal, hypercritical interpretation of the words of any contract. 'In all cases, policies of insurance are liberally construed in favor of the insured, so as not to defeat without a plain necessity his claim to the indemnity, which, in making the insurance, it was his object to secure.' 1 May on Ins. §185."

In *Liverpool Ins. Co.* v. *Ellington*, 94 *Ga.* 785, it was said: "It was not indispensable that the set of books kept should embrace

what it usually termed a cash-book, or that the books should be kept on any particular system or in a manner to render it easy rather than slow and difficult to ascertain the amount of purchases and sales and distinguish cash transactions from those on credit. It was enough that these matters would be ascertainable from the books with the assistance of those who kept them or who understood the system on which they were kept." "The books must show with reasonable certainty a complete record of the insured's business transactions, including purchases and sales for cash or credit;" but "it is not necessary that the books should be kept according to any particular system, nor that they should be such a scientific system of books as would satisfy an expert accountant in a large business house in a city." 2 Cooley's Ins. Brfs. 1822-1824. In Catlin v. Springfield Fire Ins. Co., 1 Sumn. 441, Judge Story said that "We must interpret these instruments in a reasonable manner, from the nature and objects of the parties." In Standard Fire Ins. Co. v. Willock (Tex. Civ. App.), 29 S. W. 218, it was said that there was "a substantial compliance" with the requirements of the clause, and a recovery was sustained. See also McNutt v. Virginia Fire Ins. Co. (Tenn. Ch. App.), 45 S. W. 61; Brown v. Ins. Co., 89 Tex. 599. In Jones v. Southern Ins. Co., 38 Fed. 19, it was held to be sufficient if the books were kept in the time and manner customary with merchants. The point involved there, however, was the requirement to lock the books in an iron safe at night and the time of night when this was done. See Sun Insurance Co. v. Jones, 54 Ark. 376. In Malin v. Mercantile Town Mutual Ins. Co., 105 Mo. App. 625 (80 S. W. 56), it was held that a failure to comply literally with the clause as to keeping books did not work a forfeiture. "The purpose of the requirement was that in case of loss or damage the assured would have kept such book accounts of his invoices, purchases, and sales as would show the amount of goods on hand at the time of the fire, and thus furnish data from which to make a reasonable estimate of the loss or damage." In that case the aggregate of cash sales for each day was entered, and the average profit was shown, but there was no bill of particulars of each sale. In German Ins. Co. v. Pearlstone, 18 Tex. Civ. App. 706 (45 S. W. 832), it was held, that the burden of showing a non-compliance with the "iron-safe clause" was on the company; that where as a question of fact it was

uncertain, it was for the jury; and that the test was not whether the entries on a ledger were sufficiently in detail as against a customer of the insured. (The question of burden of proof is not now for consideration; but see *Morris* v. *Imperial Ins. Co.,* 106 *Ga.* 461.) See also Phœnix Ins. Co. *v.* Padgitt, (Tex. Civ. App.), 42 S. W. 800; Burnett *v.* American Central Ins. Co., 68 Mo. App. 343; First National Bank *v.* Cleland, 36 Tex. Civ. App. 478 (82 S. W. 337); Western Assurance Co. *v.* Redding, 68 Fed. 708. Where the insured conducted a cash business, but in some instances small balances not paid were placed on tickets which were treated as cash, and the sales were so recorded, it was held that this showed the depletion of the stock and complied with the requirements of the policy. American Central Ins. Co. *v.* Ware, 65 Ark. 336 (46 S. W. 129). In Ætna Ins. Co. *v.* Fitze, 34 Tex. Civ. App. 214 (78 S. W. 370), it was held that occasional clerical omissions would not invalidate the policy, if the books as a whole would enable the company with reasonable certainty to arrive at the actual loss sustained, and that this was properly submitted to the jury under the evidence in that case. See also, on the "iron-safe clause," 1 May, Ins. § 263 A, and note *a*; Kerr, Ins. 332.

Some authorities have declared that warranties, even promissory warranties, are in the nature of conditions precedent, and that strict literal compliance therewith is necessary. 1 Wood, Fire Ins. (2d ed.) 422, § 179, and notes; 1 May, Ins. (4th ed.) §§ 156, 157. On the other hand, there is much authority that where the warranty is not of a present existing fact, or of something to be done before the contract shall become of force at all, but is a promissory warranty, and the policy is to terminate or become void upon the doing or not doing of some thing, or the happening or not happening of some event, it partakes of the nature of a condition subsequent, and substantial compliance will suffice. See authorities above cited, and also 2 Cooley's Briefs on Ins. 1480, 1486-1489, and the numerous authorities there cited; Western Assurance Co. *v.* Redding, 68 Fed. 708, 712, supra; Parcival *v.* Maine Ins. Co., 33 Me. 242; Hovey *v.* American Mutual Ins. Co., 2 Duer (N. Y.) 554; Parker *v.* Bridgeport Ins. Co., 10 Gray (Mass.) 302; Crocker *v.* Peoples Mutual Fire Ins. Co., 8 Cush. (Mass.) 79. In Turley *v.* North American Fire Ins. Co., 25 Wend. 374, Nelson, C. J., said that the language of an insurance contract "is to re-

ceive a reasonable interpretation; its intent and substance, as derived from the language used, should be regarded. There is no more reason for claiming a strict literal compliance with its terms than in ordinary contracts. Full legal effect should always be given to it, for the purpose of guarding the company against fraud or imposition. Beyond this, we would be sacrificing substance to form—following words rather than ideas." See also Ostrander, Fire Ins. (2d ed.) §135.

While there are extreme expressions here and there in both directions, it may be said that the "iron-safe clause" as to keeping books is a promissory warranty, and must be complied with; but in determining what it requires and what will satisfy its demands, a fair and liberal rather than a narrow construction is to be placed upon it. In doing this, if the question is such as to authorize outside aid from evidence, the circumstances, the subject-matter, the location and character of the business, the evidence of experts in bookkeeping, and such other like evidence as may throw light upon it may be considered. It is also to be remembered that forfeitures are not favored in the law, and where there is legitimately a choice of constructions, that which will save the contract is rather to be preferred than that which will work a forfeiture. Of course, it is not meant that plain, unambiguous language in a policy can be disregarded or changed by parol.

In *Everett-Ridley-Ragan Company* v. *Traders Ins. Co.,* 121 *Ga.* 228, it was said that "The evident intention of this clause of the contract is to enable the insurance company, by means of accurate records of the business of the insured, to ascertain with substantial certainty and definiteness the value of the stock of goods destroyed by fire." While the words "accurate records" are here used, it was not intended that a policy would be avoided for mere slight accidental omissions, or because the books kept might not come up to the highest standard of perfect or accurate bookkeeping. Nor was the decision in *Liverpool Ins. Co.* v. *Ellington,* 94 *Ga.* 785, supra, overruled or changed. In the *Everett-Ridley-Ragan Co.* case, the case of Pelican Ins. Co. *v.* Wilkerson, 53 Ark. 353 (13 S. W. 1103), was cited, but it was said that such case went somewhat further than this court found it necessary to go. In the Pelican case the insured, at the end of each month, entered the amount of purchases during the month. He also kept a book in

which he entered each day his cash sales, and at the end of each month he entered the aggregate amount of cash received on his books. The following are specimens of the entries: "Page 202, Taylor, Duffy & Co., Memphis, Tenn., 1887. June goods, $855.01; July goods bought, $435.96. . . In stock at the first of June, 1887, up to April 1st, 1888. Page 203. W. Y. M. Wilkerson, 1887, June. To money taken in, $40.00. July, to money taken in, $90.00. Paid Taylor, Duffy & Co., paid June 10th, one bale of cotton that was lost in 1886, $42. Sept., to money taken in, $40.00." It was held that the books did not furnish data necessary to enable the insurer to test the accuracy of the accounts delivered to it, nor afford any satisfactory idea of the amount of goods on hand and destroyed by the fire, and were not a compliance with the iron-safe clause. In Western Assurance Co. v. Altheimer, 58 Ark. 565 (25 S. W. 1067), the entries of cash each day consisted merely of the names of clerks with certain amounts written opposite to them. It was held that where the requirement was that a complete set of books should be kept, and there was expert evidence that the system used showed a complete record, it must be left to the jury to determine whether the covenant was complied with, and that expert evidence was admissible to explain the meaning of the term "a set of books." The Pelican case was distinguished on the ground that there was no such evidence there to aid the entries, and nothing was before the court but an apparently imperfect set of entries. The rule of strict compliance was announced. But a comparison of those two cases will show that, with the aid of expert testimony, the warranty could be quite liberally construed in that State, as to who would meet its requirements; so that, when aided by such evidence, the result did not seem to differ widely from allowing a substantial compliance. Now there is a statute in that State on the subject. Security Mut. Ins. Co. v. Woodson & Co. (June 1906).

Having at some length discussed the nature of the "iron-safe clause" as to keeping books, the mode of construing it, and the use of expert evidence in connection with it, let us now apply some of these principles to the facts of the present case. Objection is made to two classes of entries on the books, as not fulfilling the requirements of this clause of the policy: first, the entries in regard to cash; and second, as to purchases or goods brought into

the stock. The cash account on the merchandise book contained each day an entry of the cash taken in during that day in the aggregate. It is contended that this was insufficient and falls within the ruling in the case of *Everett-Ridley-Ragan Co.*, 121 *Ga.* 228, supra. If the entries were unexplained, this contention would have force in it. But the evidence showed the character of the business as stated below, that no goods were sold on credit, and that the entries only showed cash sales for the day; so that there was no mixing of cash from daily sales and from collections, or other sources, as in the case cited. And there was evidence that no goods were sold at a loss, but all at a profit ranging from twenty-five to fifty per cent., thus meeting the suggestion that the goods may have been sold at less than their value, at least so far that it can not be held, as matter of law, that the policy was rendered void for this reason.

Again, it is said that tickets of employees were treated as cash, and so entered. But there was evidence to show that this store was a small affair in the country, mainly conducted in connection with a sawmill business, and referred to as the "commissary;" that for the amounts due employees tickets were issued to them, which were treated as cash, and so used at the store; that as a purchase was made, the ticket was punched and the amount entered as a cash sale, this being equivalent to a payment in cash to the employee and a repayment by him in cash to the employer at the store; and that any amount remaining due to the employee at the end of the month was paid to him in cash. Under the evidence, we can not say that this was a violation of the clause of the policy in question, as matter of law. There was enough for the jury to pass upon. *Liverpool Ins. Co.* v. *Ellington*, 94 *Ga.* 785; *Morris* v. *Imperial Ins. Co.*, 103 *Ga.* 567 (a case which, while possibly announcing a correct principle of law, went further, as to the facts to which it applied, as appears from the record on file, than the present case requires, and may perhaps not be extended); same case, 106 *Ga.* 461.

The other objection to the books is in regard to the purchases. The plaintiff kept what he called a merchandise account, purporting to show goods purchased. The aggregate amount was $553.14. In a number of cases the entries specified the articles with prices. In others the entry was like this: "E. A. Waxelbaum Bros. bill,

$51.85; Thatcher's bill, $31.00; Allen Holmes bill, $24.75." These
latter items were eleven in number, and aggregated $258.87 in
amount, or nearly one half of the entire merchandise account. In
the absence of any further explanation, these items do not appear
to furnish any indicia of what goods were bought or added to the
stock; and, as in the Pelican case, supra, unaided by any other
competent evidence on the subject these entries do not even sub-
stantially comply with the requirement of the policy. Taking
the books, as far as shown in this record, they do not meet the rul-
ing in the *Liverpool* case in 94 *Ga.* or the *Everett-Ridley-Ragan*
case in 121 *Ga.* We therefore must reverse the judgment because
there was error in the overruling the motion for a nonsuit, and be-
cause the verdict was not supported in this regard by the evidence
in the record.

5-6. When this case was formerly before us, it was ruled that,
if at the time the application for insurance was made and the
policy issued, the company, through its agent, knew that the build-
ing insured was on leased ground, this would be a waiver of the
clause in the policy providing that it should be void if the subject
of insurance was a building on ground not owned by the insured
in fee simple, or that it would be estopped from setting up a for-
feiture on that ground. *Johnson* v. *Ætna Ins. Co.,* 123 *Ga.* 404,
107 Am. St. 92, and note. This ruling was based on a demurrer
to the declaration, which alleged that the insured informed the
agent as to the character of the ownership of the property. Noth-
ing was there held as to the question of whether a clerk of the
agent who prepared the application and delivered the policy could
waive the provision. And while that point is argued now in the
brief of counsel, it is not raised or made in the record with such
distinctness as to make a question for decision; nor to require
a consideration of the question whether, if the agent was applied
to, and referred the applicant for insurance to his clerk or assist-
ant, that would make any difference. A motion for a nonsuit was
made on the ground, among others, that there was no evidence that
the agent of the company knew of the condition of the title. In
the motion for a new trial certain charges of the court submitting
this question to the jury are complained of as having no basis in
the evidence; and it is contended that the verdict is erroneous on
a similar ground. It will be seen that these exceptions raise no

question except whether there was an absence of any evidence of knowledge by the company's agent. To answer this complaint it is only necessary to quote a sentence from the plaintiff's evidence, when he said: "We had a conversation regarding the insurance, and I told him [i. e. Clark, the agent of the company who countersigned and issued the policy] that the house was on leased land." True, in his cross-examination, he stated the matter somewhat less positively. But in the light of this quotation, it would be useless to discuss this point further. No other grounds for reversal were insisted on.

*Judgment reversed. All the Justices concur, except Fish, C. J., absent.*