## ÆTNA INSURANCE COMPANY *v.* LIPSITZ.

1. Where the only complaint as to an inventory, required by an insurance policy to be taken of the stock of goods insured, is that part of it was in Hebrew, it not being stated what portion thereof was in such language, and it not appearing from the record that any portion of the inventory was in Hebrew, such complaint is without merit.

2. It is a sufficient compliance with the usual "iron-safe clause" of a fire policy, in respect to the keeping of books, if from the books kept by the insured, with the assistance of those who understand the system on which they were kept, the amount of purchases and the amount of sales can be ascertained, and cash transactions distinguished from those on credit. There was no merit in the general exception to the instructions given to the jury on this subject.

3. As there were admittedly no conflicts in the evidence to be reconciled by the jury, the charge on this subject, even if erroneous, was not hurtful.

4. Assignments of error not referred to in the brief of counsel for the plaintiff in error will be considered as abandoned.

Argued June 5, 1907.—Decided February 22, 1908.

Action upon insurance policy. Before Judge Rawlings. Tattnall superior court. September 7, 1906.

On April 15, 1904, the Ætna Insurance Company issued to Wolf Lipsitz a policy for $3,000 on a stock of merchandise in the town of Collins, to continue in force for one year. A fire occurred March 13, 1905, greatly damaging the goods; and upon refusal of the company to pay the loss, the assured entered suit on the policy. Breach of the "iron-safe clause" was pleaded. Upon the trial the evidence submitted in behalf of plaintiff tended to show that on the night of the fire he was in the town of Hagan, where he resided, some distance from Collins, and knew nothing of the fire till the next morning; that the value of the stock of goods in the store at the time of the fire was between four and five thousand dollars, and that while the fire consumed few, if any, of the goods so that they could not be identified, they were damaged by fire to the extent of eighty-five per cent. of their value. The policy, which was put in evidence by plaintiff, contained this stipulation: "The following covenant and warranty is hereby made a part of this policy: 1st. The assured will take a complete itemized inventory of stock on hand at least once each calendar year; and unless such inventory has been taken within twelve calendar months prior to the date of this policy, one shall be taken in detail within 30 days of issuance of this policy, or this policy shall be null and void from such date, and upon demand of the assured the unearned premium from such date shall be returned. 2d. The assured will keep a set of books, which shall clearly and plainly present a complete record of business transacted, including all purchases, sales, and shipments, both for cash and credit, from date of inventory as provided for in first section of this clause, and during

the continuance of this policy. . . In the event of failure to produce such set of books and inventories for the inspection of this company, this policy shall become null and void, and such failure shall constitute a perpetual bar to any recovery thereon." The plaintiff testified in behalf of himself; and so much of his testimony as bears on the questions presented for adjudication was as follows: "The total loss I sustained was about thirty-five hundred dollars. . . I had the stock in there. . . As to what I had in there before the fire, I have got to go by what I had on the books. I know the goods that I bought. . . I did not know the value just before the fire. I know I had a big stock of goods before, and I always [had] five or six thousand dollars worth of stock on hand all the time. . . I don't know how much I did have. Concerning the books and papers on hand in the store at the time of the fire to indicate the exact amount of goods I had on hand, I had a book to put the cash on when I sold goods. Whether my books would show (the books that I saved from this fire) the amount of stock of goods I had on hand at the time of the fire—I couldn't tell that. . . I kept my cash-book showing cash sales I made every day. I kept the day's cash in my cash-book. The cash book was used so I might know what business I was doing. The cash-book contained a complete list of cash sales. Daily sales. All the cash sales. . . I swore to the insurance company that what was in my store at the time of the fire was worth forty-two hundred dollars. I know it because the books show it. . . The manner in which I arrived at . . the amount of loss was taking stock after the fire. The stock of goods was damaged eighty-five per cent. . . As a matter of fact I don't know that I could take my set of books and show the exact value of my stock of goods, the exact value of my entire stock of goods. I don't know whether I could or not. My ledger was used to put my bills in, what I bought. I entered my purchases in the ledger, nothing else. These are the only books that I kept. I am of Hebrew descent. I kept some of my books in Hebrew. My cash-book was kept in Hebrew, a part of it. Some of the cash-book that I turned over to the company was kept in Hebrew, and with some of it I did the best I could. The book that I kept as a cash-book was kept as it is now. The book shows how it was kept; it is as I kept it. . . Some of the entries are in Hebrew. . .

I do not recall whether or not my cash sales were made up and entered on my cash book. I guess I put down all the daily sales in the book; . . whatever I taken in I put it down there. . . I entered my goods that I bought in my ledger. Not all of them, I got a lot of goods I didn't put down there. There were some bills I hadn't put down yet. I put them down when I get the bills. . . I think I put down all of the bills from the time of the insurance until the fire occurred. As I said, there were some bills that were not put down in the books, because I did not put down the bills until I got them. . . I arrived at the value of the goods in the stock [at the time of the fire] by taking stock, and then I knew what I got for them, and what I gave for them, and how much I lost. . . I didn't do much credit business. I did some, very little. I haven't done much credit business, and I don't know really whether the books would show it or not. . .. When I made an entry of the collection of any goods sold, I don't know exactly where it went. : I don't think I kept much record of it. I didn't keep any record of the receipts I got from credit sales. I didn't keep any record of that at all, not by itself. I did a cash business. From the time that I took out this policy until the fire I did very little credit business. I did do some. Between the time that I took out the policy and the fire there were very little payments. When I did any credit I put it in the ledger; and when paid I put it on the other book, the cash-book. I said I made very little entry of it. It is on the ledger, what little credit business I done."

At the conclusion of the evidence submitted for the plaintiff, the defendant moved for a nonsuit. The motion was overruled, and the defendant excepted pendente lite. The plaintiff, being recalled as a witness for the defendant, testified that he kept only two books in his business, a cash-book upon which he entered his cash transactions, and a ledger in which the bills of goods purchased by him were entered, as well as the accounts of goods sold on credit. He further testified: "None of the credit sales I made during 1904 were paid before the fire." The defendant introduced in evidence an itemized inventory of the plaintiff's stock of merchandise, taken by him February 24, 1904, according to which the value of the stock then on hand was $5,590.13. An itemized inventory, taken by the plaintiff immediately after the:

fire, of the goods in stock in time, was also introduced by the defendant, according to which the value of the stock in the store at the time of the fire was $4,224.90. The defendant put in evidence the cash-book kept by the plaintiff, which purported to show a daily entry of the aggregate amount received for daily cash sales of merchandise, for each business day from February 1, 1904, to the date of the fire, without giving any of the items of goods sold; such sales footing up the sum of $7,205.50. The defendant also put in evidence the ledger kept by the plaintiff. There appeared on the ledger the names of forty-seven different persons who were, respectively, charged with a stated sum for "Mdse." on given dates intervening the date of the inventory and January 1, 1905. No items of merchandise sold to them were specified. The aggregate of these charges was $470.65. The sum of $39.85 appeared to have been collected on these accounts up to January 1, 1905. It did not appear from the ledger that any sales were made on credit after 1904, or that any money was collected after that year on credit sales previously made. There were entries in the ledger of the names of individuals or firms from whom it appeared goods were bought at stated times, from the date of the inventory to the date of the fire, the gross price being stated in each instance, without giving the items of goods purchased. The character or kind of goods purchased was in some instances indicated by the entry, as will appear from the following copies of entries:

"May Shoe Company. 1904. Paid by check 92.30. 8/26 Bill rendered 92.30."

"The Baltimore Overall Ma. Co. 1904. Paid by check 94.50 Sept. 28 Bill rendered 94.50."

"A Blumberg & Bro. 1904. Dr. 1904. By cash 96.00. Aug. 5 By Bill Skirts 96.00."

"P. H. Gordon Dr. 1904. To Cash 108.45. July 30 By Bill pants 108.45."

The aggregate amount of goods purchased, from the taking of the inventory to the fire, as appeared from the ledger, was $2,768.78.

There was a verdict in favor of the plaintiff for $2,693.37. The defendant's motion for a new trial was overruled, and it excepted to this ruling, as well as to the refusal of a nonsuit.

*King, Spalding & Little* and *C. L. Morgan*, for plaintiff in error. *W. G. Warnell* and *Hines & Jordan*, contra.

Fish, C. J.　(After stating the facts.)

1. The only complaint referred to in the brief of counsel for plaintiff in error as to an inventory is, that a portion of the one taken February 24, 1904, was in Hebrew; it not being stated what portion. We have carefully examined the inventory set out in the record and closely scrutinized the brief of evidence, and have failed to find anything tending to show that any part of the inventory was in Hebrew. We must, therefore, of course, hold that such complaint was without merit.

2. The point most strenuously insisted upon by plaintiff in error is, that, under the evidence, it appeared that the assured did not keep a set of books in compliance with the stipulations of the "iron-safe clause." In construing and applying the varying language of such a clause to the facts and circumstances of each particular case, the adjudications of the different courts of last resort in this country are not in harmony as to whether the doctrine of strict and exact compliance, or that of substantial compliance, shall prevail. See 1 Clement on Fire Ins. 265, where many of the decisions are collated. This court has applied the substantial-compliance doctrine, in contradistinction to the strict or exact-compliance doctrine. In the late case of *Ætna Insurance Company* v. *Johnson*, 127 *Ga.* 491 (56 S. E. 643, 9 L. R. A. (N. S.) 667), Mr. Justice Lumpkin, after referring to and quoting from a large number of cases, observed: "it may be said that the 'iron-safe clause' as to keeping books is a promissory warranty, and must be complied with; but in determining what it requires and what will satisfy its demands, a fair and liberal construction rather than a narrow construction is to be placed upon it. In doing this, if the question is such as to authorize outside aid from evidence, the circumstances, the subject-matter, the location and character of the business, the evidence of experts in bookkeeping, and such other like evidence as may throw light upon it may be considered. It is also to be remembered that forfeitures are not favored in the law, and where there is legitimately a choice of constructions, that which will save the contract is rather to be preferred than that which will work a forfeiture. Of course, it is not meant that plain, unambiguous language in a policy can be disregarded or changed by parol." This language is in entire harmony with the substantial-compliance doctrine applied in the earlier case of *Liv-*

*erpool Insurance Company* v. *Ellington,* 94 *Ga.* 785 (21 S. E. 1006), where it was said: "The record discloses that the plaintiff did keep a set of books, in which were entered his purchases and sales, both for cash and on credit, and that he kept a cash account, though he did not keep what is usually termed a cash-book, showing daily cash sales, or a distinct record of merchandise sold for cash. The plaintiff and his bookkeeper testified, however, that they could ascertain and did ascertain from these books the amount of cash and credit sales. Under the clause referred to, it was not indispensable that the books kept should embrace what is usually termed a cash-book, or that the books should be kept on any particular system. It was sufficient if the books were kept in such manner that, with the assistance of those who kept them, or understood the system on which they were kept, the amount of the purchases and sales could be ascertained, and cash transactions distinguished from those on credit, although it might be slow and difficult to do this. The plaintiff and his bookkeeper having testified as above stated, and the books themselves being before the jury, the court did not err in refusing a nonsuit on this ground." That the full length to which the ruling in that case went may be shown, we will state some pertinent facts which appear in the original record in the case, on file in this court. It appears from that record that the books kept by the assured were in evidence, but the record sets forth no copy of any of the books. A mere statement, which was frequently referred to in the testimony of the assured and his bookkeeper as being "a transcript from the books," was in evidence and seems to have been considered in lieu of the books. This statement was as follows:

"Dr.  Estimated Inventory, Oct. 24th ............$5,000.00
       Amt. of goods purchased from Oct. 24 to Dec. 29  1,229.39
       Amount paid for freight ..................     77.82
       25% profits on credit sales $2,078.30 makes ...   519.57
       15% profits on cash sales of $856.38 ........   128.45
                                            $6,955.23.

" Cr.  Amt. of goods sold on credit from Oct. 24th ...$2,078.30
       Amt. of cash sales from Oct. 24th ..........  856.38
             Total ...................... 2,934.68

"Which leaves the balance as the amount of stock on
    hand December 29th, 1892 ............$4,020.55."

Another statement of the same general nature, showing "cash transactions in connection with the business of Ellington, from Oct. 24 [1892] to time of fire," was put in evidence. This statement did not give particulars. There was nothing in such statement, or anywhere else in the record, indicating that any itemized account was kept of the goods sold, either for cash or on credit. or of those purchased to replenish the stock. We quote from the testimony given by the assured: "We kept an account of our cash sales, and this I will explain; we did all of our business through the Merchants Bank of Valdosta. We kept an account of all cash deposited and all cash drawn out. The difference represented the amount we had on deposit. Our collections were credited to the accounts of persons from whom we collected, and such collections were always deposited with our other cash. Timber or cotton bought or sold went to my credit, and was drawn against my account with my factors in favor of the Merchants Bank of Valdosta. These drafts would go to my credit at the bank. Our remittances to the bank would show the amount of our cash sales less collections on accounts which we credited on such accounts. My credit sales are recorded daily in my books." We quote the following from the testimony of the bookkeeper: "He [the insurance adjuster] told me to find out every source that we had gotten in any money from, and also a report where any money had gone out, in order that the difference might show what was sold for cash out of the stock. I understood this direction to be given in order that we might ascertain the amount of stock in the house at the time of the fire. . . I prepared that statement for him. . . From those books these statements were made. The statement of our credit sales was gotten entirely from those books. As to the cash sales, I had to go to the railroad company and get the stubs of the freight paid, amounting to $77.82, and see all the money that had been paid out in other ways, and such as we could not account for we figured came out of the stock. . . I then made a record of the drafts we drew on Butler & Stevens, and deposited in the Merchants Bank of Valdosta. We made it a rule whenever we paid out any money to charge it to somebody. The stubs of these drafts were kept in the house. I would take all the money we paid out, and all the sources where we got it from, and our cashbooks showed the difference. When we took the total amount of

12

cash paid out and the cash received from all sources, the difference would represent what we received from the sale of goods. . . I figured out the amount of stock we had on hand by beginning with five thousand dollars worth of stock on the 24th of October, adding to that all of the goods purchased subsequently, and then deducting from thé total all cash and credit sales. The gross amount charged would be the cash value of the goods. I made a deduction of twenty-five per cent. as profit in this figuring. The total amount of credit sales, as I figured from the books, from October 24th to December 29th, 1892, was $2,078.30, and the cash sales $856.38. . . Our profit on cash sales was about fifteen per cent. These statements were made from the books and figured in the way I have described, beginning with October · 24, with an estimate of the stock at five thousand dollars. In my judgment there was more than four thousand dollars worth of goods burned in that store on the night of the fire. . . You will find in there [the books] records of where we bought and sold cotton, and bought and sold rice. I could figure it out, but I do not know how long it would take me to figure it out before this jury, just how many dollars worth of goods we had in the store on the night of the fire. There are about two thousand pages in all of those books together. . . We did not keep a separate cash-book showing daily cash sales, nor a complete record of sales of merchandise for cash. I figured out our cash collections and sales in the way I have described to you. Some of our money we put in bank, and some of it we bought cotton with, and drew against the cotton and deposited our drafts. I can not possibly tell the cash sales for any particular day, but I could give a pretty correct account of cash received, paid out, and balance to our credit. If I take out all the money I paid out on any particular day, and every source where I received money from, and balance it, the difference would be the cash sales. It is true that I kept no complete record of daily cash sales. . . The difference between my estimate of the value of the stock and that shown by our books is explained, in my judgment, by the fact that there was more than five thousand dollars worth of goods in the store on October 24th, 1892, the date of the estimate to Dun & Co."

It is clear, therefore, that in *Ellington's* case there was a distinct ruling to the effect that the "iron-safe clause" will be sufficiently complied with if the books are kept in such a manner that,

with the assistance of those who kept them or understood the system on which they were kept, the *amount* of purchases, and not necessarily the particular articles purchased, and the *amount* of sales, and not necessarily the particular articles sold, can be ascertained, and cash transactions can be distinguished from those on credit, though this may be a slow and difficult task. *Ellington's* case was approvingly cited in Western Assurance Co. *v.* McGlathery, 115 Ala. 213 (22 So. 104, 67 Am. St. R. 26), and in Prudential Fire Insurance Co. *v.* Alley, 104 Va. 356 (51 S. E. 812). In this latter case it appeared that the book of purchases kept by the assured did not give an itemized statement of goods purchased, but showed the amount of each bill of goods purchased, when and from whom purchased; that the book of sales did not give an itemized statement of goods sold, but gave, with exceptions explained, the amount of each day's sales; and that no goods were authorized to be sold on credit, and such goods as were sold without being paid for were treated as being sold for cash and accounted for as cash. The book of purchases was objected to, because it did not give the items or articles claimed to have been purchased, nor show that they were such articles as were covered by the policy. The objection made to the book of sales was, that it furnished no data from which the insurance company could tell what had been sold, at what profit, or for what price, but merely purported to give the cash taken in each day. It was further objected that the books introduced did not "clearly and plainly present a complete record of the business transacted, including all purchases, sales, and shipments for cash and credit from the date of the inventory, as provided by the policy." It was held that the books sufficiently complied with the requirements. The ruling in that case was approved in North British & Mercantile Insurance Co. *v.* Edmondson, 104 Va. 486 (52 S. E. 350). The substantial-compliance doctrine was applied in Western Assurance Co. *v.* Redding, 68 Fed. 708 (15 C. C. A. 619), where Judge McCormick forcibly said: "It is insisted that the accounts of goods purchased should have set out the specific articles, and the value of each, and that the account of cash sales should have been equally particular as to articles sold, and the price; for, it is argued, the insured may have sold goods at one tenth of their cost price, for aught that appears in these entries of cash sales. If these accounts were to have been

thus kept, thus itemized, why not have said so? There was time and space in the clause in question to provide expressly that the inventory of stock to be taken at least once every year 'should be itemized.' If the accounts of purchases and sales were to be so itemized, why take stock at all? The credit sales are itemized, as is not only customary, but necessary. Now, when the articles purchased, the goods sold on credit, and those sold for cash are all itemized, posted, footed up, and balanced, barring moths, rust, and thieves, the difference would show the goods remaining; and the time spent, and shop wear of the stock, would either be wholly unnecessary, or, in the average country store, an expensive and worthless check on unscientific bookkeeping. When the circumstances of these respective parties are impartially considered, it is highly improbable that such a degree of extravagance or of proficiency in bookkeeping on the part of the insured was in the contemplation of either of them, and certainly was beyond the conception of the insured, and can not be considered to have been in the mind of the agent of the insurer, without a high impeachment of his integrity, for he must have known that such a set of books as the contention now made by his company requires would not be kept." See, in this connection, the remarks of Chief Justice Brickell, in Western Assurance Co. *v.* McGlathery, 115 Ala. 219 (22 So. 104, 67 Am. St. R. 26), quoted in *Ætna Insurance Co.* v. *Johnson,* 127 *Ga.* 491 (56 S. E. 643, 9 L. R. A. 667). There are many well-considered cases where the substantial-compliance doctrine has been upheld, which are cited in 1 Clement on Fire Ins. 266 (2) ; 2 Cooley's Ins. Briefs, 1822-1824; and in *Ætna Insurance Co.* v. *Johnson,* supra. Several of the cases so cited have gone further than this court has seen fit to go in *Everett-Ridley-Ragan Co.* v. *Travelers Insurance Co.,* 121 *Ga.* 228 (48 S. E. 918, 104 Am. St. R. 99). It has been frequently held that where a policy of insurance is so framed as to leave room for two constructions, the words used should be interpreted most strongly against the insurer, for the reason that the company's attorneys, officers, or agents prepared the policy, and it is its language that must be interpreted. Royal Ins. Co. *v.* Martin, 192 U. S. 149-162; (48 L. ed. 385, 24 Sup. Ct. 247) ; 19 Cyc. 656, and cases cited; Am. & Eng. Enc. L. (3 Supp.) 671, n. 3. Why is it that, in the face of this often-announced rule, and the numerous decisions of courts in this country of the highest

respectability, applying, during the past decade or longer, the doctrine of substantial compliance to the provisions of the "iron-safe clause," the insurance companies, whose able attorneys and vigilant and capable officers and agents must know of such rulings, will persist in failing to explicitly state in the "iron-safe clause" that the books kept by the assured must show all the specific articles purchased and sold, the date of each such separate transaction and the name, or names, of the other party, or parties, thereto, and the price of each article, if such be the requirements really intended to be observed? There is nothing equivocal in the stipulation: "The assured shall take a complete itemized inventory of stock on hand at least once each calendar year." Why not have said, if such were intended to be the real agreement, that: "The assured will keep a set of books, which shall clearly and plainly present a complete record of every article purchased or in any way added to the stock, showing from whom obtained, when, and the price of same, also of every article sold for cash or on credit, to whom, when, and the price of same, and a like detailed record of shipments, from date of inventory, as provided for in the first section of this clause, and during the continuance of this policy." Is it not fairly inferable that the reason why such explicit language is not used is, that the insurance companies well know that merchants, in the large majority of instances at least, would decline to accept a policy in which such requirements were expressed?

*Ellington's* case, 94 *Ga.* 785 (21 S. E. 1006), was decided in 1894, and has never been overruled or its soundness questioned; so it can be no surprise to the insurance company to have the doctrine so clearly announced in that case now applied. In the light of that case, how stands the case at bar? We will give a summary of the material evidence. According to the testimony of the plaintiff and that of several disinterested merchants, none of which was disputed, the value of the stock of goods in the store, at the time of the fire, was between four and five thousand dollars; a very small quantity of the goods was entirely consumed; almost the entire stock was there, and could be readily identified, and its value estimated by those familiar with the value of such goods. Such witnesses testified that the damage by fire to the stock was eighty-five per cent. of its original value; and this was not disputed. There was no intimation that the fire was caused by any

act of the assured.  The insurance company undertook to prove
that the policy had been forfeited by the failure of the assured to
keep a set of books in compliance with the stipulations of the
"iron-safe clause" of the policy.  As we have said, it was shown
that the assured kept a cash-book, from the date of the policy, in
which was daily entered the amount of the day's cash sales, with-
out an itemized statement of the goods sold, and a ledger in which
was entered the amount of each bill of goods purchased to re-
plenish the stock, when, and from whom purchased (where such
bills had been received before the fire), but with no itemized ac-
count of such goods.  There was also entered in the ledger a state-
ment of the amounts due by certain persons for merchandise sold
to them on credit, the names of such debtors, dates of sales, and
aggregate amount due being given in each instance, without an
itemized statement of the goods sold.  It appeared that little
credit business was done.  The amounts collected for goods sold
on credit were entered in the ledger to the credits of the debtors
paying the same.  It did not appear from the cash-book that any
such collections were entered on it, though, from the testimony of
the assured, this may have been done; but if so, the total amount
of such collections appeared from the ledger to be $39.85, and if
all of this said sum had been entered in the cash-book, the amount
of cash sales could be readily ascertained by deducting that sum
from the total amount of cash received as appeared from the cash-
book.  The assured testified that some portions of his books were
kept in Hebrew, but the record brought up by the insurance com-
pany fails to show in what respect this is true; and therefore
we are unable to pass upon the materiality of this point.  The as-
sured also testified:  "Whether my books would show (the books
that I saved from this fire) the amount of stock of goods I had
on hand at the time of the fire—I could not tell that. . . As
a matter of fact I don't know that I could take my set of books
and show the exact value of my stock of goods, the exact value of
my entire stock of goods.  I don't know whether I could or not."
Could not the jury find from this evidence that, from the books,
with the assistance of those who kept them, or who understood
the system on which they were kept, the amounts of purchases and
sales were ascertainable, and cash transactions distinguishable from
those on credit?  We think it is clear that the evidence author-

ized such a finding, and that, under the rule in *Ellington's* case, supra, there had been a sufficient compliance with the "iron-safe clause" as to keeping books. It did not matter that the assured could not say whether his books would show the amount of stock on hand at the time of the fire, or that he did not know whether or not he could take his books and show the exact value of his stock at that time, or that no witness testified that he understood the system of bookkeeping on which the books were kept, and that from them the amounts of purchases and sales were ascertainable, and cash transactions distinguishable from those on credit. For, as we have seen, such were not the tests prescribed in *Ellington's* case. The evidence clearly showed how the books were kept; and it is apparent that from them, with the assistance of any one who had the slightest knowledge of any system of bookkeeping, the amounts of the purchases and sales were ascertainable, and cash transactions distinguishable from those on credit. This was sufficient, though the assured did not know whether the books would show the amount of stock on hand at the fire, or whether he could show from them the exact value of the stock at that time. From what we have said, it follows that the court did not err in overruling the motions for nonsuit, and for a new trial, on the ground that a breach of the "iron-safe clause" was shown.

We will now notice the decisions of this court in reference to the "iron-safe clause," which have been cited by counsel for the plaintiff in error. *Scottish Union & National Insurance Co.* v. *Stubbs,* 98 *Ga.* 754 (27 S. E. 180). It was there held, that the "iron-safe clause" in a policy of insurance is a promissory warranty on the part of the insured, and not a mere representation; and that the court in instructing the jury upon the effect of such clause should not leave them to pass upon its materiality, or to treat it as a mere incidental matter to be considered by them in connection with the subject of furnishing proofs of loss. *Southern Fire Insurance Co.* v. *Knight,* 111 *Ga.* 622 (36 S. E. 821, 52 L. R. A. 70, 78 Am. St. R. 216). There the ruling was: "An invoice of goods purchased is not an inventory of stock to be produced under the 'iron-safe clause' of a fire policy." *Hester* v. *Scottish Union etc. Co.,* 115 *Ga.* 454 (41 S. E. 552). In that case it appears from the record of file in this court, that a policy on a stock of merchandise was issued to Hester on August 26, 1898,

to continue for one year. The goods were destroyed by fire on July 4, 1899. The assured made no pretense of keeping any books from the date of the policy to January 2, 1899. On these facts the trial court granted a nonsuit, and the judgment was affirmed by this court in a headnote. *Everett-Ridley-Ragan Co.* v. *Travelers Insurance Co.,* 121 *Ga.* 228 (48 S. E. 918, 104 Am. St. R. 99). It was there held that the "iron-safe clause" "is not complied with where it appears that the only record of cash sales kept is a cash-book in which no detailed transactions are recorded, and only the aggregate amount of cash derived from all sources is set down at the end of each day." There the assured testified: "I do not know how from my books it could be ascertained the value of the stock of goods at the time it was burned, except from my independent recollection of the amount of goods on hand, and from the entries made on my ledger of purchases made by me." In the opinion it was said: "A cash-book which only shows the amount of cash taken in at the end of each day, giving no indication of the source from which the cash is derived, whether from cash sales, from the payment of past-due bills, or what not, can in no sense be considered 'a complete record of business transacted, including all purchases, sales, and shipments, both for cash and credit.'" It appears, therefore, that the ruling was based on the fact that the cash-book did not show that the entries thereon were for cash received from goods sold on the day the entries were made, and not on the ground that the articles sold were not specified. There was no evidence from which it could be ascertained what amount of the cash received, as it appeared on the cash-book, was for goods sold for cash. Mr. Justice Candler, who delivered the opinion, cited Pelican Ins. Co. *v.* Wilkerson, 53 Ark. 353 (13 S. W. 1103), showing, however, that the ruling in the case cited went somewhat further than it was necessary to go in the case with which he was dealing; and also cited *Ellington's* case, supra, "where," he said, "this court has adopted a more liberal rule than was held by the Arkansas case, supra." It is true that the learned Justice also said: "The evident intention of this clause of the contract is to enable the insurance company, by means of accurate records of the business of the insured, to ascertain with substantial certainty and definiteness the value of the stock of goods destroyed by the fire." But, as was said by Mr.

Justice Lumpkin, in *Ætna Insurance Co.* v. *Johnson,* supra, in referring to this language of Justice Candler: "While the words 'accurate records' are here used, it was not intended that a policy would be avoided by mere slight accidental omissions, or because the book kept might not come up to the highest standard of perfect or accurate bookkeeping. Nor was the decision in *Liverpool Insurance Co.* v. *Ellington,* supra, overruled or changed." None of the rulings in any of these cases is in conflict with the *Ellington* case. Another case relied on by plaintiff in error is the case just above referred to, *Ætna Insurance Co.* v. *Johnson,* where the rulings set forth in the third and fourth headnotes were as follows: "3. Where a small store or 'commissary' in the country was conducted in connection with a lumber business, and tickets were given to the employees for the sums due them for work, which were treated as cash at the store, the amount of purchases being indicated on the ticket by a punch and entered as a cash sale; and where it appeared that there were no credit sales, but the aggregate of such sales each day was entered at the close of the day, and that all goods were sold at a profit of from twenty-five to fifty per cent., it can not be said as matter of law that this was a violation of the requirement as to keeping books. 4. Where a merchandise account was kept as showing goods purchased, the aggregate amount of the whole being $558.87, and where some of the items stated the character of the goods and their price, but there were other items aggregating in amount nearly one half of the whole sum, which merely stated the name of some person or firm, with the added word 'bill,' and an amount, in the absence of any other evidence to show that there was in this regard a compliance with the requirement as to keeping books, it does not on its face appear to meet such requirement." The ruling contained in the third headnote, in regard to the cash received for goods sold, is in complete harmony with the substantial-compliance doctrine announced in *Ellington's* case, notwithstanding the strong intimation that the account kept of cash received from daily sales was aided by evidence "that all goods were sold at a profit of from twenty-five to fifty per cent." There is no requirement in the clause that the books shall show the profit at which goods are sold, and we apprehend that books of this character do not show this fact. Moreover, from the nature of mercantile businesses, and

especially where a variety of goods is dealt in, it must evidently be a mere matter of estimate, and a very broad estimate, too, as to what is the average profit made on goods sold. The ruling in the fourth headnote is to the effect, that, in order to substantially comply with the requirements of the "iron-safe clause" as to keeping books, a book must be kept by the assured which shows, or from which, by the aid of competent extrinsic evidence, it may be reasonably ascertained, what particular goods have been bought or added to the stock during the life of the policy. This ruling is in accord with that made in the Pelican case, 53 Ark. 353 (13 S. W. 1103), where it appeared that the assured kept a cash account in a book in which he entered each day his cash sales, and at the end of each month entered the aggregate amount of cash received; and that in another book he kept a merchandise account, where, at the end of each month, he entered the amount of purchases during the month; that he also kept a cotton book, showing all cash and goods paid for cotton, and a credit or sale book showing all credit sales. Nothing appeared in any of the accounts or books, so far as the reported facts show, to indicate what particular goods had been sold or purchased. "All bills of purchase showing all goods purchased" were kept, and "the books and papers were all exhibited to the jury, except some invoices, which had been lost." It was not shown at what profit, if any, the goods were sold. In the opinion delivered in that case it was said: "It is impossible to obtain any correct or satisfactory idea of the amount of goods on hand, and destroyed by the fire, from this mode of bookkeeping. For aught that the books show, goods of the value of $400 may have been sold for $40, as the items are not given, but only the aggregate amount of sales." The following quotation, among others, was then made from Jones v. Insurance Co., 36 N. J. Law, 35 (13 Am. R. 405): "The names of the persons from whom goods were alleged to have been bought, and the gross amounts, would not enable the insurers to test the accuracy of the account delivered to them. . . A detailed list of the articles lost, where this is practicable, is the intent of the parties; and courts should only relax the requirement where the nature of the case does not admit of such particularity;" citing, Catlin v. Insurance Co., 1 Sum. 434 (Fed. Cas. 2522) ; 2 Wood on Ins. §449; O'Brien v. Ins. Co., 63 N. Y. 111-113. The Arkansas court then said: "This

appears to be a sound rule, which we approve as applicable to this case." It was accordingly held: "The appellee, having failed to keep a set of books showing a record of all business transacted, including purchases and sales for cash or credit, as he undertook to do, was not entitled to recover." That decision held the insured to a more strict compliance with the clause in question than the rule of substantial compliance subsequently prescribed by a statute of that State, which was passed in 1899; and, as was said, as above noted, in *Everett-Ridley-Ragan Co.* v. *Insurance Co.*, 121 *Ga.* 221, this court, in *Liverpool Insurance Co.* v. *Ellington*, 94 *Ga.* 785, "has adopted a more liberal rule than was held by the Arkansas case, supra." As we have shown, there is nothing in the record of file in this court in *Ellington's* case which indicates, that the assured kept books showing either the particular goods, the quantity or price thereof, sold for cash or on credit, or the particular goods, the quantity or price thereof, purchased to replenish his stock of merchandise, or that any extrinsic evidence was introduced which tended to establish any of these things. The decision in that case was rendered by a full bench, as the court was then constituted, and as it has never been overruled, it is binding authority and must be followed. In *Johnson's* case, 127 *Ga.* 491, where the assured sold goods exclusively for cash and at a given profit, it was held, in effect, that it could not be said as matter of law that his failure to keep an itemized account of sales, showing the items or particular articles sold, was a violation of the "iron-safe clause." If it is not necessary to keep a detailed list of the articles sold for cash, we can not understand why it should be necessary, relatively to the insurer, to keep such a list of the articles sold on credit. The fact that the books were not so kept as to furnish proof against a customer to whom credit had been extended, in the event of suit against him, does not render them insufficient as to the insurer. German Insurance Co. *v.* Pearlstone, 18 Tex. Civ. App. 706 (45 S. W. 832). If it is not essential that the assured shall make and preserve a detailed list of the goods he sells, why is it essential that he should make and preserve a detailed list of the goods added to his stock by purchase? If the one be unnecessary, it seems that the other is equally so. If, as said in Jones *v.* Insurance Co., 36 N. J. Law, 35 (13 Am. R. 405), "A detailed list of the articles lost . . is the intent

of the parties," how is it possible to procure such a list, when an itemized account of the goods added to the stock by purchase is kept, but no such account of the goods taken from the stock by sales is kept? If a complete itemized inventory were taken of the stock on the date of the policy, and there were kept exact, detailed lists of goods subsequently added thereto by purchases and taken therefrom by sales, even then, owing to the many contingencies usually incident to all businesses of considerable magnitude, it would hardly be possible to obtain an exactly correct detailed list of the articles lost by the fire. No such strictly literal requirement is called for by any decision of this court, but, on the contrary, it has been held, as we have shown, that a substantial compliance is all that is necessary. The ruling set out in the fourth headnote in *Ætna Insurance Co.* v. *Johnson, 127 Ga.* 491, is not in harmony with the ruling made in *Ellington's* case in 94 *Ga.*

The court charged the jury: "If you find the plaintiff kept such a set of books and papers as would clearly and plainly present a complete record of business transacted, including his purchases, sales, and shipments, and his cash and credit sales from the date of the inventory to the fire,—if he (plaintiff) kept such a set of books and papers as would enable the ascertainment of the amount of stock, and they were kept in such a manner that by the assistance of oral testimony in the case as would authorize you to find that a correct value of the stock could be ascertained, you would be authorized to find for the plaintiff." The exception to this instruction was: "Which said charge was error and practically wiped out the iron-safe clause." In view of what has heretofore been said, there was no merit in this general assignment of error.

3. The court instructed the jury, that it was their duty to reconcile, if they could, any conflicts there might be in the evidence, so as to give effect to all the testimony delivered in the case; but if there was a conflict of such a nature that the jury could not reconcile it, then it was their duty to search the mass of testimony for the truth of the transaction, and there place their verdict. One of the exceptions to this charge was that it was inapplicable, because there was no conflict in the testimony. If there was no conflict, then we can not see how the charge, even if erroneous, was hurtful.

4. The grounds of the motion for a new trial relating to the exclusion of evidence were not referred to in the brief of counsel for the plaintiff in error, and must be considered as abandoned.

*Judgment affirmed. All the Justices concur, except Holden, J., who did not preside, and Lumpkin, J., dissenting.*

LUMPKIN, J. An insurance policy is a contract. Where the provision commonly known as "the iron-safe clause" is duly made a part of the policy, it becomes a part of the contract; and as such is as binding as any other part of it. It is a promissory warranty, and has been held to be binding on the insured. *Southern Fire Insurance Company* v. *Knight,* 111 *Ga.* 628; *Scottish Union Co.* v. *Stubbs,* 98 *Ga.* 754. There has been some conflict in the rulings of different courts as to whether the insured was bound to a strict and literal compliance with the requirement as to keeping "a set of books," and what would constitute a sufficient set of books, and whether slight omissions or irregularities would work a forfeiture of the policy, or whether a substantial compliance would suffice. In this State it has been held that the promissory warranty contained in the iron-safe clause must be complied with; but that, in determining what it requires, a fair and reasonable construction is to be placed upon it. *Ætna Insurance Company* v. *Johnson,* 127 *Ga.* 491; *Liverpool Ins. Co.* v. *Ellington,* 94 *Ga.* 785. I do not disagree with the majority of the court as to the rule, but as to the application of it to this case. I do not think that the decision in the case last cited is controlling to the extent to which the majority of the court do. In that case the original record shows that the plaintiff testified without objection that he kept his books in his iron safe, and then said: "They contained a complete copy of my business. I always kept a set of books, showing a complete record of my sales." His bookkeeper testified that "There were about two thousand pages in all these books together, and while it would take me some time, yet I understand them, and can tell you what you want by looking." The books seemed to have been kept in a somewhat confused manner, but there was testimony that from them the required information could be derived. The books were not copied in the evidence, except a few items as to cash sale. What the opinion of the majority of the court discusses as if it were a transcript or copy from the books was not so in fact, but was a summary or tabulated state-

ment made up from the books at the request of the agent of the company, and used for convenience, as shown by the evidence of the plaintiff, though once or twice referred to in the record as a "transcript," evidently by inadvertence. The record does not show how the entries of purchases were made. There was some point as to certain entries of sales. But the exact point now involved is whether the entries of purchases and sales taken together, and even with such aid as could be legitimately derived from the parol evidence, showed a substantial compliance with the iron-safe clause. The parol testimony here is quite different from that in the *Ellington* case.

In *Ætna Ins. Co.* v. *Johnson, 127 Ga.* supra, the difference between the literal and the fair and reasonable mode of construction of the "iron-safe clause" was discussed. The place involved in that case was a little country store or "commissary" connected with a lumber business, and tickets were given to the employees for sums due them for work, and were treated as cash at the "commissary," the amount of a purchase being indicated by a punch on the ticket and entered as a cash sale. There were no credit sales; all goods were sold at a profit of twenty-five to fifty per cent.; and the aggregate of cash sales was entered each day. We said that such entries of cash, in view of the business and all the evidence, could not be said as matter of law to avoid the policy. Nor do I think the two rulings then made inconsistent with each other. On the whole case there presented, we thought the books were insufficient to comply with the contract. And I think the same of the evidence here. The plaintiff in this case testified: "I don't know that I had as much as ten thousand dollars worth of goods in that stock. I don't know how much I did have." He did use the word "exact" once or twice, in speaking of whether the books would show the stock on hand; but he also stated flatly, "Whether my books would show (the books that I saved from the fire) the amount of stock of goods I had on hand at the time of the fire, I do not know." After stating that he entered purchases in his ledger, he said, "Not all of them; I got a lot of goods I did not put down there. There were some bills which I hadn't put down yet. When I would get the bills I would put them down." Again: "I didn't keep any record of the receipts I got from credit sales. I didn't keep any record of

that at all, not by itself." Also: "I kept some of my books in Hebrew. My cash book was kept in Hebrew, a part of it." Also: "The manner in which I arrived at the loss and the amount of the loss was taking stock after the fire." There was no expert evidence as to the character of the books, or what is customary, and nothing else which would serve to aid the plaintiff's evidence. This does not appear to me to be a compliance with the contract to keep a set of books which should clearly and plainly present a complete record of business transacted, including all purchases, sales, and shipments, both for cash and credit. *Scottish Union Co.* v. *Stubbs,* 98 *Ga.* 754, 761; *Everett-Ridley-Ragan Co.* v. *Traders Ins. Co.,* 121 *Ga.* 228; *Liverpool Ins. Co.* v. *Ellington,* 94 *Ga.* 785 *Ætna Ins. Co.* v. *Johnson,* 127 *Ga.* 491; *Rives* v. *Fire Ass'n. of* Philadelphia (Tex. Civ. App.), 77 S. W. 424; *Morris* v. *Imperial Ins. Co.,* 106 *Ga.* 465-467 (32 S. E. 595).