18071. METROPOLITAN LIFE INSURANCE COMPANY *v.* JAMES.

In this suit upon a policy of insurance the evidence conclusively and as as a matter of law demanded a finding in favor of the defendant's plea of material misrepresentations inducing the contract. The verdict in favor of the plaintiff was unauthorized and the court erred in refusing a new trial.

DECIDED JANUARY 17, 1928.

Complaint on life policy; from Chatham superior court—Judge Meldrim. March 3, 1927.

*William L. Clay,* for plaintiff in error.

*Ullmer & Dowell,* contra.

BELL, J. Mrs. Stella James brought suit against Metropolitan Life Insurance Company upon a policy of insurance issued upon the life of her husband, Benjamin A. James, in which she was named as beneficiary. The defendant defended the suit upon the grounds of fraud and material misrepresentations in the application for insurance. The verdict was in favor of the plaintiff, and the defendant excepted to the refusal of a new trial. The application was in parts A and B, and was attached to the policy as a part of the contract. In part A were the following stipulations:

"1. That the foregoing statements and answers are correct and wholly true, and, together with the answers to questions on part B hereof, they shall form the basis of the contract of insurance, if one be issued.

"2. That no agent, medical examiner, or any other person, except the officers of the company, have power on behalf of the company: (a) to make, modify, or discharge any contract of insurance; (b) to bind the company by making any promises respecting any benefits under any policy issued hereunder.

"3. That no statement made to or by, and no knowledge on the part of, any agent, medical examiner, or any other person as to any facts pertaining to the applicant shall be considered as having been made to or brought to the knowledge of the company, unless stated in either part A or B of this application."

The policy contained the following provision: "This policy and the application therefor constitutes the entire contract between the parties, and all statements made by the insured, in the

Life Insurance, 37 C. J. p. 464, n. 26; p. 533, n. 42; p. 637, n. 33.
New Trial, 29 Cyc. p. 820, n. 35.

absence of fraud, shall be deemed representations and not warranties; and no statement shall avoid the policy or be used in defense of a claim hereunder, unless it be contained in the application therefor and a copy of such application is attached to this policy when issued."

Parts A and B of the application both purported to have been signed by the insured. Part B contained, among others, the following questions and answers:

"6. Present condition of health? Good.

"7. (a) When last sick? March, 1920. (b) Nature of last sickness? Influenza. (c) How long sick? 15 days.

"9. Any physical or mental defect or infirmity? If yes, give the particulars. No.

"18. Have you been attended by a physician during the last five years? If yes, give name of complaint, dates, how long sick, and names of physicians. No.

"19. Have you had any treatment within the last five years at any dispensary, hospital, or sanatarium? If yes, give date, duration, name of ailment, and name of institution. No."

The policy was dated March 3 and delivered March 6, and the insured died on April 16, 1926.

The evidence on the trial established that, although the insured had answered that his last sickness was in March, 1920, that he had not been attended by any physician during the past five years, and that he had no treatment during this period at any dispensary, hospital, or sanatarium, the truth was that within less than twelve months prior to the application he had been attended by physicians, and had spent several days in the Atlantic Coast Line Hospital at Waycross, where he was treated for high blood pressure. It appears that he was advised to go to the hospital at the particular time by one Dr. Clay, to whom he had applied for additional benefits in the nature of insurance in the relief department of the Atlantic Coast Line Railroad Company. Dr. Clay testified in part as follows: "As a physician I have not attended Benjamin A. James within five years prior to the 24th of February, 1926. He came to me for physical examination, August 31, 1925. At that time I found him suffering with high blood pressure, the exact points I do not recall, but something over 200, and advised him that it would be impossible to accept his application for addi-

tional life insurance, that is, additional benefit in the Atlantic Coast Line Relief Department. I advised him that it would be necessary for him to see a physician at once and put himself under the careful attention of a doctor for some time, as his condition was rather serious. I am a physician for the Atlantic Coast Line Company. B. A. James was an employee of the Atlantic Coast Line Company. The benefit I spoke of was in' the Relief Department of the Atlantic Coast Line Railroad Company, in which no one can be a member except employees or those who have been employees. I do not recall how much insurance he was applying for. I do not recall ever having treated B. A. James. I think he had what we call the second class, which would entitle him to $500 death benefit, and my impression is that he had come in to raise his insurance to the full amount of the fifth class, which would be $1250. I made blood-pressure test in my examination. I used that method in some cases, not in all. I recall seeing James subsequent to that time. He was working at the time I saw him, I think the 23d of September, 1925. He had been in the hospital of the Atlantic Coast Line Railroad Company between those dates. He was anxious to go to work, and we did not want to keep him from work unnecessarily, and I gave him a permit to go back to work. August 31, 1925, was the date I failed to pass him for additional insurance. I am the medical examiner for the Atlantic Coast Line Relief Department at this point. He came to me for his examination; that was the first examination made for the additional insurance. . . Yes, I would feel that he was a bad risk and should not be accepted for insurance so long at least as that condition existed or possibly for several years after it had cleared up, to be sure that it would not recur. We do not know these causes always, what the cause of the high blood pressure is. If the point or focus causing that high blood pressure can be located and eliminated, then we have some reason to anticipate an improved condition. If they can not be located, we do not."

Dr. Williams testified: "I am a physician and have been a physician in Savannah for eighteen years. Benjamin A. James was not treated by me within five years. I examined him and advised him to be treated. It was February 20, 1926. That was when I first examined him. The date of my examination was February 20, 1926. He was complaining of headache and high

blood pressure. I took his blood pressure on account of continued headaches. I think the blood pressure was about 210, the best I can remember; I don't remember exactly, but over 200. For a man of his age the normal is about 135 or 140. As stated in this report of mine, the cause of his death was cerebral hemorrhage, and the contributory or second cause was hypotentia, and that produced cerebral hemorrhage. He came to me, I guess, for treatment. I examined him and told him he had better go to the hospital. I advised him to go to the hospital at Waycross, where he could get proper treatment, and better treatment than at home. He came to me with headache. I guess he was working at that time."

According to the evidence of Dr. McCullough, he treated the insured for twelve days in September, 1925, for arterial hypertension, and this was a contributory or secondary cause of his death in the following April, the immediate cause being cerebral hemorrhage. As shown by the other evidence, it was during this period that the insured was at the railroad hospital. The plaintiff herself testified that her husband, the insured, was at the hospital for about fifteen days, under treatment for high blood pressure, and verified the fact that he went there with the expectation of so improving his condition that he might procure insurance, or additional benefits, in the railroad relief department, for which he applied to Dr. Clay. The plaintiff further testified that when the company's agent delivered the policy she told him that she was "glad to get it, because Dr. Clay thought he [the insured] had high blood pressure." None of the above testimony was contradicted, and there was no issue as to the credibility of any of the witnesses.

Under the evidence as stated, a verdict in favor of the defendant was demanded as a matter of law, and the court should have granted a new trial upon the general grounds of the motion. Counsel for the plaintiff, the defendant in error, argue that, upon an inspection of the insured's admittedly genuine signature on part A of the application and the handwriting of the medical examiner, Dr. Redmond, in part B, the jury were authorized to find that what purported to be the signature of the insured to part B was not in the handwriting of the insured, but was in the handwriting of Dr. Redmond. It is thus contended that the evi-

dence warranted the inference that the insured was not the author of the answers as set forth in part B, and that neither the defense of fraud nor of material misrepresentations, predicated upon these answers, may be said to have been sustained as a matter of law. The original policy, with the photostatic copy of the application, has, by agreement of counsel, been submitted to this court for examination by the judges upon this point.    There is no contention that the insured did not sign part A of the application, and it is that part which contains the limitations upon the company's agents, including the medical examiner.    Part A contained also the stipulation that the answers set forth both in part A and in part B shall form the basis of the contract of insurance, if one be issued.

Where, in conformity with the requirements of section 2471 of the Civil Code (1910), the application is attached to the policy and by the terms of the contract is made a part thereof, and where the authority of the medical examiner is limited, as in the contract before us, the beneficiary, in suing *upon the policy,* can not impeach the application as thus integrated therein.    If the application falls, so does the policy, and in founding her action upon the policy she is committed to the proposition that the answers were made by the insured as set forth in the application.    This rule is not changed by thé fact that the plaintiff fails to include the application in the copy of the policy attached as an exhibit to the suit.    *Wilkins* v. *National Life Ins. Co.,* 23 *Ga. App.* 191 (2, *c*) (97 S. E. 879); *Travelers Protective Asso.* v. *Belote,* 21 *Ga. App.* 610 (3) (94 S. E. 834); *Puckett* v. *Metropolitan Life Ins. Co.,* 32 *Ga. App.* 263 (122 S. E. 791).

On all other questions this case is a counterpart of *Jefferson Standard Life Insurance Co.* v. *Henderson,* post, 704, and what we have said in that case will apply equally to this case.    The verdict in favor of the plaintiff was unauthorized.    As this ruling appears to be controlling, we omit any reference to the special grounds of the motion for a new trial.

*Judgment reversed.    Jenkins, P. J., and Stephens, J., concur.*