19240. PILGRIM HEALTH & LIFE INSURANCE CO. *v.* GOMLEY.

DECIDED JUNE 17, 1929.

*M. B. Peacock, Bennet & Peacock,* for plaintiff in error.
*Cowart & Durden,* contra.

BELL, J.  The defendant, for the purpose of reducing the liability under the policy, pleaded that the insured died of Bright's disease within twelve months from the date of the policy, and that this was a constitutional disease within the meaning of the quoted provision.  The plaintiff admitted that the insured died of Bright's disease, but took issue with the defendant as to the nature and character of such disease, and the verdict was against the contention of the defendant, being for $150 as principal, and for additional amounts as attorney's fees and damages.  This was to

allow the plaintiff only half the face amount, because the death occurred within twelve months, but to deny a further reduction as for death by an excepted disease.

A physician introduced as a witness by the defendant testified that in his opinion Bright's disease should be classed as a constitutional disease, while another physician introduced by the plaintiff testified to the contrary. The testimony of this witness was objected to by the defendant on the ground that the question was not one of fact to be decided by the jury, but involved a construction of the contract, and was therefore one for determination by the court. The overruling of this objection is complained of in one of the grounds of the motion for a new trial. The defendant further contends that, even in the face of evidence to the contrary, this court, on the basis of judicial notice, should hold that Bright's disease is a constitutional disease within the meaning of the policy, and thus should set aside the verdict, on the general grounds of the motion.

Each of the witnesses referred to spoke of medical definitions of the term "constitutional disease," one of them having quoted certain medical works defining such a disease as, "one affecting the entire constitution—the whole constitution of the body,—not local but pertaining to the constitution," or as "intrinsic, organic, or structural defects in body mechanism, affecting the entire system or constitution." While the medical dictionaries may be helpful, they should not be controlling in determining the question at issue. In deciding whether the particular disease of which the insured died was a constitutional disease within the meaning of the policy, the descriptive words must be understood in their ordinary signification, and should not be interpreted in the technical sense in which they might be used by the medical profession. Insurance companies do business chiefly with the common people, whose thinking is not technical, and, therefore, the expressions contained in a policy should, in the absence of a contrary import, be defined according to the usual understanding, and be construed strictly against the insurer, where otherwise they would tend to limit the range and force of the obligation. Civil Code (1910), § 4268 (1); Meyer v. Fidelity & Casualty Co., 96 Iowa, 378 (65 N. W. 328, 59 Am. St. R. 374); Beile v. Travelers' Protective Association, 155 Mo. App. 629 (135 S. W. 497); Richards v. Stand-

ard Accident Ins. Co., 58 Utah, 622 (200 Pac. 1017, 17 A. L. R. 1183) ; 32 C. J. 1147. Certainly here the diseases intended to be excepted were described in common, everyday verbiage, such as would be used by the average man, and with absolutely no effort to speak in terms of medical or scientific knowledge. For instance: "consumption" is the lay expression for tuberculosis; "rheumatism" is a name more applicable to symptoms than to a specified ailment; the word "paralysis" is not technical; nor is "child birth," or "womb disease." In fact, practically every word in the stipulation is a mere loose expression to designate an illness by the name given to it by the masses. Hence, we think that the language "constitutional disease" should be construed in like manner. *Standard Oil Co.* v. *Swanson*, 121 *Ga.* 412 (49 S. E. 262) ; *Weatherly* v. *Mayor &c. of Athens*, 18 *Ga. App.* 734 (2) (90 S. E. 494).

While the people generally may have no definite concept as to the meaning of the phrase, "constitutional disease," they do occasionally speak of such diseases, and each of the two words composing this phrase has a very common usage, in view of which the instant policy should be studied. The word "constitution," as applied to natural persons, is defined in Webster's International Dictionary as, "the aggregate of the physical and vital powers of an individual; physique or physical nature," and in the same work we find the word "constitutional" defined as follows: "Belonging to or inherent in the constitution or structure of body or mind; as, a constitutional infirmity." The Century Dictionary adds: "Springing from or due to the constitution or composition." Another definition which might be given from the books is, "relating to or affecting the constitution." However, if the word is susceptible of more than one meaning, the court, in construing the contract should adopt the one most favorable to the insured. *Columbia Casualty Co.* v. *Rogers*, 157 *Ga.* 158 (121 S. E. 224). The meaning of a general term may be limited where it is favorable to the insured to do so, and where such a construction appears to be fair and reasonable upon a consideration of the entire contract. Hence, the last definition suggested above will be discarded, as will any others except the one most favorable to the insured, the purpose being to exclude all diseases which do not clearly fall within the terms the policy. "Affecting" might suffice in

part if by it we mean directly affecting, and if other necessary qualities are expressed in the definition.

The word "disease," as a general term, may be defined as any alteration in the state of the body or of some of its organs, interrupting or disturbing the performance of the vital functions (Webster's Dictionary; 18 C. J. 1139), and in this broad sense a portion of the body might be said to be diseased when it ceases to perform its proper functions, although the disorder therein may be the mere result of some affection or malady which in its primary operation is restricted to a different area. However, in the instant policy the word "disease" does not stand alone, but is limited by another term, which must be given due and important consideration in arriving at the intended sense of the words under construction. "Belonging to" and "inherent in," as contained in Webster's definition of "constitutional," each connotes the idea of permanency, if not also of original attribute; but we do not think that a constitutional disease as commonly understood would necessarily and in every case include hereditary or even natal quality.

In Metropolitan Life Ins. Co. v. Bergen, 64 Ill. App. 685, the insurer contended that pneumonia was a pulmonary disease within the meaning of a certain provision limiting liability in event of death within one year from such a disease. The court said: "In common acceptation, a pulmonary disease is one which arises from an inherent or organic defect or affection of the lungs, and it is our opinion this provision of the policy was not intended to include, and should not be construed to include pneumonia, which is but a temporary inflammation of those organs." It would seem that the language for interpretation in that case was less restrictive than that with which we are concerned in the case at bar.

We can not say that the term "constitutional disease" is so general or indefinite as to be entirely ignored in the construction of the contract. The parties evidently intended something, and it is the duty of the courts to ascertain such intention and enforce it. We are of the opinion that a constitutional disease is one which inheres in or pervades the general vital system, and is characterized by some degree of permanency, although it may not necessarily be incurable or last during the entire life of the person suffering therefrom (*Penn Mutual Life Ins. Co.* v. *Millon,* 160 *Ga.* 168 (2), 127 S. E. 140, 40 A. L. R. 1382), as distinguished from a disease

which is merely temporary or one which, though indirectly affecting the entire system, is yet local in its primary manifestation. It is a disease *of* the constitution, and is not one which merely produces therein some indirect consequence. In determining the character of such a disease as it is referred to in the policy, the words descriptive thereof must be taken as applicable to the disease as it exists generally, and should not necessarily be confined to the effect of such disease upon a particular individual as the insured in this case.

Even to lay aside any question as to permanency, no matter how seriously the fundamental structures or organs may be affected, if the disease does not operate as an immediate cause directly thereon it is not a constitutional disease within the meaning of the policy, and this should be true even though death might be the common or indeed the inevitable result. To say that a disease is a constitutional disease merely because it may in some manner affect the constitution would make the policy so general as to render it practically meaningless, since every serious disease probably produces an ill consequence of some nature to the system of the persons afflicted therewith. Assuredly it was not the intention of the parties to the instant agreement to make of it a mere accident policy, although this would be the practical result for the first twelve months should a disease be classed as constitutional merely because it produces death.

Since we have in this State no statute invalidating such a provision, there is no doubt that the language under consideration, properly construed, constitutes a valid condition of the contract (37 C. J. 383). But the courts should give to every contract a commonsense construction, resolving all doubts against forfeitures and attaching to the language used such signification as will favor the object to be accomplished and not defeat the evident purpose and intention of the parties. See, in this connection, *Johnson* v. *Mutual Life Ins. Co.,* 154 *Ga.* 653 (2) (115 S. E. 14) ; *Continental Life Ins. Co.* v. *Wells,* 38 *Ga. App.* 99 (142 S. E. 900) ; *Candler Investment Co.* v. *Cox,* 4 *Ga. App.* 763 (62 S. E. 479) ; *Ætna Ins. Co.* v. *Lipsitz,* 130 *Ga.* 170 (2) (60 S. E. 531, 14 Ann. Cas. 1070) ; *Moorefield* v. *Fidelity Mutual Life Ins. Co.,* 135 *Ga.* 186 (2) (69 S. E. 119) ; 13 C. J. 541.

While there may be but few diseases which could be classed as

constitutional according to our interpretation of the particular policy, there are conceivably some diseases which might be so regarded, although any attempt at enumeration would exceed the legitimate scope of this discussion, not only amounting to obiter, but extending also, perhaps, to matters with which we could not deal without evidence.

Courts may take judicial cognizance only of such facts as have become matters of common knowledge among the people of ordinary intelligence within the jurisdiction (*Southern Ry. Co.* v. *Covenia,* 100 *Ga.* 46, 29 S. E. 219, 40 L. R. A. 253, 62 Am. St. R. 312; *Rome Ry. & Light Co.* v. *Keel,* 3 *Ga. App.* 769 (2), 60 S. E. 468; *Central of Georgia Ry. Co.* v. *Lawley,* 33 *Ga. App.* 375 (3), 126 S. E. 273; 23 C. J. 60) ; and while this court might know without proof that Bright's disease is a serious malady and one that would deter a prudent insurer (compare *National Life Ins. Co.* v. *Jackson,* 18 *Ga. App.* 494 (2), 89 S. E. 633; *Metropolitan Life Ins. Co.* v. *James,* 37 *Ga. App.* 678, 141 S. E. 500; *Jefferson Standard Life Ins. Co.* v. *Henderson,* 37 *Ga. App.* 704, 141 S. E. 498), we can not without evidence take notice that such a disease is a "constitutional disease" within the meaning of the policy under consideration. Not only are we unable to rule with the plaintiff in error upon this question, but it is our opinion that the evidence was insufficient to authorize a finding in its favor upon such issue. There was no evidence which more strongly tended to establish the contention of the defendant as to the character of such disease than the following testimony of a physician introduced as a witness for the defendant: "Bright's disease is a disease of the kidneys. There are several types, and this disease is due to many causes, but the result of Bright's disease is a lack of the kidneys performing their functions,—by performing their functions I mean their work, and this work is the throwing off of clinkers, or foreign matter, which we do not use in the vital economy of this body. We speak of those foreign bodies as urea, uric acid, lesion, ceratin, and to be specific there are known twenty-two of those eliminations that have been isolated and that are known as by-products of nitrogen. The kidney's function is to throw off the by-products of nitrogen and water, and when it fails we speak of Bright's disease. Bright's disease affects the entire physical economy—affects the entire body—on account of the kidneys' inability

to throw off the by-products of nitrogen; therefore the by-products of nitrogen remain in the system and the system is thereby poisoned. The entire system is poisoned, and by that I mean the entire body—the entire blood stream. Those by-products I speak of remain in the blood on account of the inadequacy of the diseased kidneys to eliminate them. Bright's disease is a constitutional disease."

It is apparent, however, that the witness was testifying in medical terms, and not in the sense in which the language of the contract might be understood by the non-technical mind. It is evident, furthermore, that his characterization of Bright's disease as a constitutional infirmity was predicated solely upon the fact that the kidneys, being diseased, fail to properly perform the work of elimination which nature assigns to them.

If the primary defect is located only in the kidneys, and if the system becomes injuriously affected merely because of a lack of elimination, due to this defect, the disease does not, in its character as such, inhere in or extend to the general system, but is simply a local disease producing an indirect general consequence, (1) the disease causing the poison, and (2) the poison causing the discomfiture or cessation of the normal functions.

Since the burden was on the defendant to bring the case within the exception of the policy by reason of which it sought to reduce its liability (*Slaten* v. *General Exchange Ins. Corp.*, 38 *Ga. App.* 415 (2), 144 S. E. 53), the plaintiff was entitled to a verdict upon that issue, in the absence of any sufficient proof to authorize a finding for the defendant thereon. We are clear that under our interpretation of the policy there was no evidence whatever to establish that Bright's disease is a "constitutional disease" within the meaning of such a contract. It follows, that, as to the principal sum awarded, the verdict in favor of the plaintiff was demanded as a matter of law, and that any errors in the charge of the court in relation to that issue were harmless. It results also from what has been said that the court did not err in admitting the testimony objected to, and that, except as to the amount recovered as attorney's fees and damages, the verdict in the plaintiff's favor ought to stand, irrespective of any of the alleged errors.

Pending the motion for a new trial the plaintiff struck the amount recovered as attorney's fees, and the judgment is therefore

affirmed if the plaintiff at the time the remittitur from this court is made the judgment of the court below will also write off the amount recovered as damages; otherwise the judgment is reversed.

It is unnecessary to pass specifically upon other questions presented, or to add more to what is said in the headnotes.

*Judgment affirmed, on condition. Jenkins, P. J., and Stephens, J., concur.*